**William JOLLY, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 95–CF–1145.**

District of Columbia Court of Appeals.

Argued Nov. 14, 1997.

Decided Dec. 23, 1997.

Gretchen Franklin, Public Defender Service, with whom James Klein and Ira Mickenberg, Public Defender Service, were on the brief, for appellant.

John L. Brownlee, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Thomas J. Tourish, Jr., and Catherine F. Sheehan, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN, FARRELL, and REID, Associate Judges.

FARRELL, Associate Judge:

On this appeal from his convictions for felony murder while armed (robbery) and related offenses, Jolly's primary argument is that repeated instructions to the jury by the trial judge unfairly limited his ability to demonstrate the bias of key government witnesses. The disputed instructions stemmed from the judge's effort to draw a line between two defenses: (a) a legitimate bias defense that these witnesses had falsely accused Jolly to avert police suspicion from themselves (in the case of one witness) or another person close to them as the true murderer, and (b) what the judge determined was an unfounded theory that either of those two persons had in fact committed the crime. The distinction is a fine one because, to be believable, the bias defense presupposed that the witnesses had *reason* to fear the person they were protecting would be incriminated. Thus, the instruction the judge repeatedly gave reminding the jury that no evidence *in fact* linked the other persons to the crime potentially weakened a bias defense that the judge recognized as legitimate. The distinction the judge made is a settled one in our decisions, however, and after careful examination of the record we are convinced that his actions did not unfairly limit Jolly's ability to argue the bias of the witnesses to the jury. We reject appellant's remaining contentions as well, and therefore affirm.

I.

On August 8, 1994, taxi driver Keith Moore was shot to death during a robbery at about 10:00 p.m. on Douglas Road, S.E. Witnesses placed appellant Jolly in the company of codefendant Dwayne Taylor [1] a half hour before the murder when Taylor phoned for a taxi and Moore responded in his cab to the Marlboro Plaza Apartments, where Jolly lived. A police officer working as a private security guard at the apartments saw Jolly

---

1. Taylor's case was severed from Jolly's before trial.

(whom he knew) seated in the cab presumably with Taylor moments before the cab departed. Although the only person who witnessed the shooting[2] could not identify the assailants, two sisters, Valencia and Joycelyn Turner, testified that Taylor (their cousin) and Jolly, whom they knew well and who. sometimes stayed overnight at their house, banged on their door between 9:30 and 10:00 p.m. that evening and entered hurriedly. Taylor had blood dripping from a hand wound, and both men went upstairs to the bathroom. Valencia followed them and saw them dividing up money apparently taken from a black pouch and wallet they were holding. Together with a pager in Taylor's possession, the pouch and wallet were later identified as belonging to the murder victim. Jolly and Taylor put the pouch and wallet in a paper bag, poured beer over it, and went outside for fifteen minutes, returning empty-handed. Police later found those items and their contents in woods near the Turner house, charred from an attempt to burn them. The next day, Jolly called Valencia Turner from jail and asked her to find the "game pieces" concealed in three places in the house; she looked there and found a gun disassembled in three parts, which she threw away.

Another government witness, Michael Edwards, testified that on the afternoon before the murder, Jolly visited him and said he wanted to "go out tonight" and "get some money." He asked Edwards to come but Edwards declined, saying he had to stay home with his girlfriend. Jolly returned that evening with Taylor and again asked if Edwards wanted to go with them, saying "We might get a lot of money tonight." Edwards declined. During this visit Jolly took out a .40 caliber handgun and cleaned it. The cab driver was shot with a .40 caliber pistol.

Jolly's defense was that while he had been with Taylor at the Marlboro Plaza apartments until the taxicab arrived, he left the scene before it departed carrying Taylor and an unidentified third person as passengers.

## II.

Jolly contends that a series of instructions which the judge gave the jury during trial unfairly restricted his ability to show that the key witnesses Edwards and the Turner sisters incriminated him falsely to deflect police suspicion from themselves or another person close to them as the real murderer. Edwards was on probation at the time of the shooting, admitted he had picked up Jolly's gun during the latter's visit not long before the shooting (possibly leaving his fingerprints on it), and—so the defense asserted—more closely resembled Taylor's accomplice in height than did Jolly. These facts, Jolly maintained, led the police to suspect Edwards[3] and when they conveyed that suspicion to Edwards, he took refuge in falsely accusing Jolly. As to the Turner sisters, the defense theory was that they falsely named Jolly as Taylor's accomplice to divert attention from the father of one of Joycelyn Turner's children, Jimmy Smith, whose photograph the police found during a search of the Turner house depicting Smith with a handgun.

### A.

The issue of whether this defense was a veiled effort to imply to the jury, without supporting evidence, that Edwards or Smith rather than Jolly had been Taylor's *actual* accomplice arose first after the defense opening statement when the prosecutor objected that the defense had tried to suggest that Edwards and the Turner sisters were "protecting ... the real killers," Edwards and Jimmy Smith.[4] The judge thought it was "a

---

2. Douglas Road resident Monica Nichols heard three gunshots and then saw two men standing over the cab driver as he fell; she watched them flee, one holding a gun. Francisco Brown heard the shooting from a distance and saw two men run by; he recognized the one carrying the gun as Taylor.

3. The police denied at trial that Edwards was ever a suspect in the shooting.

4. As to Edwards, defense counsel had declared in opening statement, in part:

> You'll learn that the police accused Mike Edwards of being involved in this crime. That they told Mike Edwards they thought he had been in the cab when Keith Moore was shot. And so to protect himself, Mike Edwards came up with a story.... And he knew the police were pointing the finger at him.

very close call" but agreed that "by playing a little loose with the term suspect [defense counsel] certainly suggested that there was another suspect ... and that means in a lay person's mind that maybe this other person did it"; the suggestion was "just sort of dangling up there now." The defense disputed that it had implied Edwards or Smith "were [actual] suspects"; "[w]e said that [the witnesses] believed [in the case of Edwards] they were suspects or the people connected to them believed they were suspects," which gave the witnesses a "bias to put Mr. Jolly in the case." Understanding the defense to concede that it had "no evidence that [Edwards or Smith] committed this offense," the judge was still troubled that "the lay person on a jury" hearing the word "suspect ... naturally thinks that means a person who may be responsible." He therefore instructed the jury at the outset as follows:

> During the defense opening statement [counsel] ... asserted that three individuals Michael Edward[s], Brian Shaw and Jimmy Smith may at some point [have] considered themselves to be suspects in this case.

> It was also suggested that the police may have considered the individuals to have been suspect at some point in the earlier point of the police investigations.

> First, let me warn you that the lawyers['] opening statements are not evidence. Second, there will be no evidence introduced in this trial to suggest that these three people may have committed the crimes for which Mr. Jolly stands accused.

During the testimony of government witnesses, the judge repeatedly explained the difference between the bias theory that the jury could consider and the inference it could

not draw. He allowed the defense to cross-examine Valencia Turner about whether she believed Jimmy Smith was a suspect, but instructed the jury as follows:

> There is no evidence that Jimmy Smith may have committed the offense for which Mr. Jolly is on trial. The purpose of this line of cross examination went to a more narrow issue, that is what the witness may or may not believe about Jimmy Smith's possible involvement, but there is no evidence that Jimmy Smith is connected to this offense at all.

While Joycelyn Turner was being cross-examined, the judge likewise stated in the jury's presence:

> I have already explained the limited basis for this line of exploration and ... told the jury with respect to [the]re being no evidence that connects Mr. Smith to this offense and the reason why the defense is exploring it is so the jury can consider it on the issue of any bias she may have had to protect someone else, but there is no evidence in the case.

During cross examination of Edwards the judge reminded the jury of the earlier instructions,[5] and during the prosecutor's summation, when the defense objected that the prosecutor was mischaracterizing the earlier instructions on this point, the judge stated a last time: "The instructions were[,] there were several named individuals and I instructed you that there is no evidence that those people are connected in any way with the offense for which Mr. Jolly is on trial."

### B.

Jolly contends that the drumbeat of repeated instructions stating that neither Edwards nor Smith was "connected with the

---

> So Mike Edwards made up a story ... protecting himself....

> ....

> All you'll have is ... [t]he word of a man who was told by the government that he was a suspect in this case.

Regarding the Turner sisters, counsel stated:

> The Turners also knew that William Jolly had been arrested. And they knew that the police were after Dwayne Taylor. And you'll learn that the Turners had to point the finger at someone because suspicion had fallen on them

and their loved ones. Two men in their lives by the name of Brian Shaw and Jimmy Smith.

By the time of closing argument, the defense had effectively deleted Brian Shaw (also a friend of the Turners) as one whom the Turners were assertedly protecting, and the name does not figure significantly in appellant's argument on appeal.

5. "I have told them that ... there is no evidence of record that [Edwards] is connected with the shooting but you can certainly cross examine."

shooting" gravely weakened his defense that Edwards and the Turners feared—and had reason to fear—that the police would make that connection, and so they attempted to shift the eye of suspicion to Jolly. The government responds that the judge's instructions were a legitimate precautionary measure once he concluded (a) that the defense could not properly argue that Edwards or Smith was Taylor's actual accomplice under the standards of *Winfield v. United States,* 676 A.2d 1 (D.C.1996) (en banc), and yet (b) portraying Edwards or Smith as "suspects" could mislead jurors into surmising that either was the second perpetrator.

 Our recent decision in *Newman v. United States,* No. 94–CF–1263, (D.C. August 7, 1997), recognized the conceptual similarity between a defense of bias stemming from a witness's desire to protect a third person and a defense that evidence identifying that person as the actual perpetrator is enough to create a reasonable doubt of the defendant's guilt.[6] Nevertheless, the distinction between the two is settled in our cases. To mount a defense that Edwards or the Turners were motivated to shift the blame wrongly to Jolly, Jolly had only to present "some facts which support a genuine belief that the witness [was] biased in the manner asserted." *Jones v. United States,* 516 A.2d 513, 517 (D.C.1986) (internal quotation marks omitted). The judge did not dispute that Jolly had made that showing. But to present the defense that Edwards or Smith in fact may have been Taylor's accomplice, Jolly had to make a twofold showing: (a) that evidence "tend[ed] to indicate some reasonable possibility that [those] person[s] other than the defendant committed the charged offense,"

*Winfield,* 676 A.2d at 4 (citation omitted); and (b) that that evidence was more probative than prejudicial such that the judge could not fairly exercise his discretion by "exclud[ing] it as] marginally relevant evidence creating the danger" of "distract[ing] the jury from the issue in this case," *id.* at 5, *i.e.,* "*this* defendant's guilt or innocence." *Id.* at 3 (emphasis in original).

 Jolly does not dispute these principles, nor strongly argue that he met the *Winfield* test.[7] He argues instead that the judge exaggerated the risk that the jury would confuse a bias defense with a third-party-accomplice defense, and over-reacted with instructional language strongly conveying the impression that the bias defense had no evidentiary basis. The issue is a troubling one because of the fact pointed out at the beginning: a bias defense based on a witness's subjective belief that a person close to him is under suspicion can have little chance of succeeding unless that belief is also somehow reasonable. Thus an instruction telling the jury that the third-person is "not connected with the offense" can damage a legitimate defense.[8] We therefore are of the view, and emphasize, that it should be given cautiously. For the following reasons, however, we are convinced that the judge's actions did not impair Jolly's ability to present the bias defense to the jury.

 First, the judge could fairly recognize on this record a danger that the jury would mistake the bias defense for one of actual complicity of Edwards or Smith unless an instruction distinguished between the defenses. Since the risk of such confusion can arise as much from the tone and shading of counsel's statements and questions as from

6. In *Newman,* we found error because the trial court had refused a proffer of facts that would have shown both a motive by a government witness to lie to protect her real accomplices, slip op. at 13–14, and a reasonable possibility that others in fact were the accomplices under a *Winfield*-type analysis. *Id.* at 14–20.

7. In his brief Jolly renews the argument, made to the trial court for the first time in the discussion on final instructions, that there was evidence permitting the inference that Edwards was Taylor's actual accomplice. The trial judge did not abuse his discretion in concluding otherwise. No evidence placed Edwards at the scene where,

and the time when, the taxi picked up Taylor and his companion, and none placed him on or near the scene of the murder or in the house of the Turners to which the murderers brought the driver's property. Nor did any evidence suggest an intent on his part to commit a robbery that might have led to the slaying.

8. Such a defense may "implicate[] both 'the [constitutional] right of confrontation and the right to present a defense.'" *Newman,* slip op. at 22 (quoting *Bassil v. United States,* 517 A.2d 714, 716 (D.C.1986)).

the use of words like "suspect," the identification of that risk must lie within the sound exercise of the trial judge's discretion. "It is peculiarly within the knowledge of the trial judge whether remarks of counsel during the trial tend to prejudice the cause of a party." *Smith v. United States*, 315 A.2d 163, 167 (D.C.1974) (quoting *United States v. Goodman*, 110 F.2d 390, 394 (7th Cir.1940)). Defense counsel's repeated allusions to Edwards' and Smith's status as suspects and the reasons therefor justified the judge's fear that the jury would confuse the valid defense with an improper one.

Further, the judge mentioned to the jury at regular intervals the legitimate aim of the defense's questioning witnesses about their awareness of police suspicion, saying "it is so the jury can consider it on the issue of any bias she [the witness] may have had to protect someone else." That instruction allowed the defense to argue that Edwards was shielding himself and the Turners were protecting not just Smith but codefendant Taylor, who, counsel had elicited from Valencia Turner, was the Turners' cousin and actually lived with them at the time of the murder. In closing argument, the defense emphasized at length the motive Edwards and the Turners each had to shift the blame to Jolly.

 Third, in gauging the likely influence of the disputed instructions on the jury's consideration of bias, we necessarily must make some judgment as to the intrinsic strength or weakness of the defense offered. A reviewing court may not conjecture, of course, as to which items of the government's proof the jury found most telling, but it is inescapable that the Turners' testimony about Jolly's actions immediately after the murder—dividing up the victim's receipts, then trying to destroy his belt pouch and wallet—was devastating to the defense if the jury believed it. Yet the claim of bias as to the Turners rested upon an asserted desire to protect a person, Smith, whom no evidence at all linked to the crime by way of motive or presence during the events. Indeed, but for the police later finding a photograph of

Smith in the Turners' house carrying a handgun, the bias evidence as to Smith likely would not have met the *Jones* standard of admissibility, *supra.* Jolly seeks to fortify this gun evidence by claiming that the judge unfairly refused to let him elicit Valencia Turner's view that the gun Smith carried was a .40 caliber or at least looked like the one she had thrown out at (she said) Jolly's request. But even if she had answered those questions yes,[9] Smith's role as a possible suspect was still too weakly founded in evidence to persuade us that the judge's instructions played a role in the jury's rejection of the bias defense.

We reiterate, however, that this is a particularly sensitive area of the criminal law where an over-readiness by the trial judge to enforce the limitations of *Winfield, supra,* by instructions can appear to disparage a bias defense which it is the jury's province to evaluate. It is thus an area demanding circumspection.

### III.

 Jolly's chief remaining contention is that a voir dire question the judge asked the jury venire failed adequately to elicit from jurors whether they would tend to believe the word of a police officer more readily than that of other witnesses. We agree that the question asked by the judge was inartful, but we are not persuaded that the failure to ask a better question prejudiced Jolly's ability to select an impartial jury.

Aware that the government intended to call police officers as witnesses, the judge asked the jury panel in voir dire this question:

[W]ould any of you *automatically* believe the testimony of a witness because that witness was a police officer? Or on the other extreme, would any of you *automatically* reject the testimony of a witness merely because that witness was a police officer?

Would anyone of you—any of you do either thing, just *automatically* believe it

9. In fact, when defense counsel asked Valencia whether the gun Smith carried in the photo was a .40 caliber, she answered "I don't know what kind of gun it was" before the judge sustained objection to further questioning on the point.

or *automatically* disbelieve it, without even listening to its context and seeing whether if [sic] it made sense to you? If you think you would, just because a police officer said something, you would not evaluate it in the context of whether it made sense to you, but *automatically* would accept it or reject it, then I'll hear you at the bench. [Emphases added.]

Three prospective jurors approached the bench. The third opined that the judge's word "automatically [is] strong" but that, as a former assistant police commissioner in New York, he would find it "kind of hard to put police officers and other people on an equal footing in terms of believability." When follow-up questioning of these jurors was finished (the judge allowed the attorneys to conduct such follow-up), Jolly's counsel asked that an additional question be put to the whole panel about police bias, saying that, as the third juror's response had implied, "maybe we'd get more answers" if the judge "didn't say automatically" in asking how they would view police testimony.[10] The judge declined to ask more questions on this point.

■ The disputed question was at least potentially misleading. As appellant points out, a juror might not be disposed "automatically" to accept police testimony, but still be inclined to give more weight to it than to other testimony. An adequate question probes the *relative* weight a juror might tend to give such testimony solely because of its source. That accords with this jurisdiction's standard end-of-trial jury instruction, which the judge gave here, which states that "[i]n no event should you give either *greater or lesser* weight to the testimony of any witness merely because s/he is a police officer." Criminal Jury Instructions for the District of Columbia, No. 2.26 (4th ed.1993) (emphasis added).

But, although the judge's question conceivably might have let slip through the voir dire net a juror tending to favor police testimony to some degree, we do not think it was misleading or inadequate enough to warrant reversal on the record before us. This court and our federal court of appeals have reversed a conviction on related grounds only when the judge completely failed to question the jury panel "about 'possible disqualification' for bias regarding [police] testimony," and "the government's case consist[ed] entirely of police testimony." *Jenkins v. United States,* 541 A.2d 1269, 1274 (D.C.1988) (quoting *Harvin v. United States,* 297 A.2d 774, 777–78 (D.C.1972)). *See also Brown v. United States,* 119 U.S.App. D.C. 203, 205, 338 F.2d 543, 544–45 (1964); *Sellers v. United States,* 106 U.S.App. D.C. 209, 210–11, 271 F.2d 475, 476–77 (1959) (per curiam).[11] Neither test is met here. The judge did ask the panel a question designed to elicit attitudes about police testimony; Jolly's argument is that the question was too narrow, as at least one juror recognized. But that juror *did* respond to the question, and, indeed, the reactions of all three who responded furnish evidence that the question asked was efficacious—and certainly not tantamount to none at all, as in the decisions cited above. The

10. Jolly had originally requested that the jurors be asked whether any "would be more [or less] inclined to credit the testimony of a police officer than ... to credit the other witnesses."

11. *Gibson v. United States,* 649 A.2d 593 (D.C. 1994), *on rehearing,* 700 A.2d 776 (D.C.1997), departs from this pattern only slightly. A division of the court there held originally that when

· the government announces its intent to rely almost exclusively on police officer witnesses to attempt to prove its case and several prospective jurors respond that either they or their family members are connected with law enforcement, the trial court, upon request by a defendant, must permit at least some minimal further inquiry which could elicit bias in favor of police testimony.

649 A.2d at 596. On rehearing in light of this court's decision in *Lyons v. United States,* 683 A.2d 1066 (D.C.1996) (en banc), the division retreated somewhat from that holding. While finding "considerable force in the original Hearing Division's view [quoted above]," the division concluded that any assumed error in refusing to permit the follow-up questioning in light of *Lyons* was harmless error. 700 A.2d at 778–79. The combined opinions in *Gibson* stand reasonably for the point that a single question about possible bias directed to jurors self-selected as having ties to law enforcement may not always suffice, particularly if the government's case will depend "almost exclusively" on police testimony. In the present case, no objection is made to the questioning of the jurors who responded to the question about bias; Jolly's claim is only that others mights have responded to a broader question.

juror already quoted said that it would be "kind of hard to put police officers and other people on an equal footing." The second juror admitted he did "have a bias in favor of the police," and the third stated variously that he was "for the police" or "pretty much for the police." The reactions of these jurors provide reassurance that the rest of the panel were not lulled into thinking *some* bias in favor of police testimony required no response.

Further, as our discussion in part II revealed, police testimony was by no means the sum total of the prosecution's case. Sergeant Bimbo, to be sure, was the only witness who put Jolly directly in the taxi cab, but civilian testimony (as well as fingerprint evidence) placed him in Taylor's company just before or after Taylor telephoned for the taxi. And the combined testimony of Edwards and especially the Turners, if believed, virtually dictated a conclusion that Jolly was Taylor's accomplice. Therefore, the defect in the judge's voir dire question about police bias was insufficient to permit reversal.[12]

## IV.

The government agrees that on remand the trial court must vacate Jolly's conviction and sentence for armed robbery. *See Catlett v. United States,* 545 A.2d 1202, 1219 (D.C. 1988). In all other respects, the judgment of conviction is

*Affirmed.*

---

**12.** We find no error in the judge's refusal to admit selected portions of a statement to the police by Taylor as a declaration against penal interest. *See Williamson v. United States,* 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994); *Laumer v. United States,* 409 A.2d 190 (D.C.1979) (en banc). Nor are we persuaded that the prosecutor's closing argument shifted the burden of proof or otherwise yielded error sufficient to require reversal.