# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 14-CF-414, 14-CF-424, and 14-CF-669

PAUL ANTHONY ASHBY, KEITH A. LOGAN,
AND MERLE VERNON WATSON, APPELLANTS,

v.

UNITED STATES, APPELLEE.

Appeals from the Superior Court of the
District of Columbia
(CF1-3069-10, CF1-21619-10, and CF1-23411-11)

(Hon. Herbert B. Dixon, Jr., Trial Judge)

(Argued December 19, 2016                    Decided January 10, 2019)

*Alice Wang*, with whom *Samia Fam* was on the brief, for appellant Paul Ashby.

*Thomas T. Heslep* for appellant Keith Logan.

*Margaret M. Cassidy* for appellant Merle Watson.

*James A. Ewing*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Elizabeth H. Danello*, *Michael Liebman*, and *Erik Kenerson*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*,[*] FISHER, *Associate Judge*, and NEBEKER, *Senior Judge*.

---

[*] Chief Judge Blackburne-Rigsby was an Associate Judge at the time of argument. Her status changed to Chief Judge on March 18, 2017.

NEBEKER, *Senior Judge*: Appellants Paul Ashby, Keith Logan, and Merle Watson appeal, together and separately, various convictions related to the kidnapping and murder of Carnell Bolden and the shooting of Danielle Daniels on December 30, 2009. The three were jointly tried before a jury in July and August of 2013, and were found guilty of a majority of the charged offenses. Given the factual and legal complexities, the number of issues, and the length of this opinion, we set forth a table of contents below.

## TABLE OF CONTENTS

**I. FACTUAL BACKGROUND**
**II. ANALYSIS**
    **A. Alleged *Brady* Violations and Sanctions**
    **B. Motions to Suppress Evidence**
        i. The Search of 70 W Street, N.W.
        ii. Ashby's Cell phone Records
    **C. Admission of Out-of-Court Statements**
        i. Statements Against Penal Interest
        ii. The State-of-Mind Exception
        iii. Denial of Severance
    **D. *Winfield* Defense and Bias Cross-Examination**
        i. *Winfield* Defense
        ii. Bias Cross-Examination
    **E. Sufficiency of the Evidence for the Daniels Shooting Conviction**
    **F. The *Pinkerton* Instruction**
    **G. The Prosecutor's Closing Argument**
    **H. Logan's Unannounced PFCV Conviction**
    **I. Merger of Convictions**

**III. CONCLUSION**

**I. FACTUAL BACKGROUND**

On December 30, 2009, the victims, Carnell Bolden and his girlfriend Danielle Daniels, drove to W Street in the northwest quadrant of the District of Columbia. At approximately six in the evening, Ms. Daniels dropped off Mr. Bolden so he could briefly visit some friends.

Appellant Logan and his girlfriend, Queen Williams, lived on the top two floors of a house located at 70 W Street, N.W., near the area where Ms. Daniels dropped off Mr. Bolden. Logan's uncle, Bruce Adams, was the owner of the home. Derrick Hill had rented the basement apartment, paying rent to Logan, from February or March until November 2009. Mr. Hill and Mr. Bolden were good friends, and Mr. Bolden supplied crack cocaine for Mr. Hill to sell from the basement apartment. Logan was aware of this arrangement, and had purchased cocaine from Mr. Bolden through Mr. Hill in the past. Logan also sold heroin out of the top two floors, and used the drug himself.

After Mr. Bolden exited the car, Ms. Daniels waited in the car. When Mr. Bolden did not return within ten minutes, as Ms. Daniels had anticipated, she

began calling his cell phone. When she received no response, she got out of the car and spent approximately five to ten minutes searching the length of the street, all the while attempting to call Mr. Bolden, and saw no one outside. Ms. Daniels then got back into the driver's seat of her car and shut the door.

Close to 7:00 p.m., Ms. Daniels saw in the driver's side mirror that someone was approaching the driver's side of the car from behind. This "dark figure" in a black hooded sweatshirt "put a gun up to the window and just started shooting." After the assailant stopped shooting and fled, Ms. Daniels exited her car, called for help, and, within five minutes, called 911. Her 911 call was placed at about 7:15 p.m. A neighbor on W Street was looking out her window and saw a "man in dark clothing with a hood" run down the street, and she also called 911 in response to gunshots. Ms. Daniels was subsequently able to receive medical attention and survived the shooting. However, she was hospitalized for three months and underwent several surgeries; at the time of trial, she suffered from nerve damage and loss of use of her left hand.

On the morning of December 31, 2009, a Metropolitan Police Department ("MPD") officer found Mr. Bolden's body twenty-five feet off the side of the road near the 3000 block of Park Drive, S.E.; it appeared to have been dragged there.

The cause of Mr. Bolden's death was determined to be two gunshot wounds to the face that appeared to have been fired at close range.[1] Duct tape covered Mr. Bolden's mouth and eyes, his pants were pulled down, and his feet were bound by duct tape, packing tape, and electrical cords "consistent with" having been pulled from a television set. Mr. Bolden also had multiple injuries, including bruising on his left eye, his nose, right cheek, and upper lip; hemorrhaging was also found under the right side of his scalp.

After searching the 70 W Street house, discussed further in section II.B.i below, the police found substantial evidence establishing that Mr. Bolden had been murdered there. Mr. Bolden's blood was found on a jacket that Mr. Hill gave to the police. A piece of tape found on Mr. Bolden's body was a "fracture match" with a roll found in the basement, showing that the piece of tape had been torn from that roll. A television set missing a cord like the one found on Mr. Bolden's body was also recovered. Additionally, Mr. Bolden's blood was found in a car which Logan had access to; it had been driven by Ms. Williams and was found abandoned about five blocks from the W Street house on January 8, 2010, days

---

[1] No form of identification was found on Mr. Bolden's body, but the police were able to confirm his identity through a fingerprint database.

after the murder. A neighbor also testified that the car had been parked around 70 W Street in the past.

Substantial evidence also linked appellants to the murder. Appellants Ashby and Watson had been seen at and around the 70 W Street house in the weeks leading up to the murder. Ashby and Watson had a "close" relationship, and, on December 24, 2009, Watson, Ashby, and Logan were together for at least forty-five minutes at the 70 W Street house. Logan had called Mr. Bolden twice on December 30, 2009, at 4:19 p.m. and 5:47 p.m. Watson also called 911 from his phone at 6:44 the evening of December 30, 2009, about thirty minutes before Ms. Daniels was shot, to falsely report the shooting of an undercover police officer.[2] Phone records and location data regarding Ashby's call activity, discussed in section II.B.ii below, revealed that Ashby had called Watson five times between 12:59 p.m. and 6:27 p.m. the night of the shooting and murder, from the vicinity of the crime scene, and an expert testified that, based on the progression of phone calls, Ashby's phone had traveled south, towards the area where Mr. Bolden's body was found.

---

[2] The government argued at trial, and appellants disputed, that Watson made this call in order to divert police away from the location where he and the other appellants were moving Mr. Bolden's body into a car.

In addition, John Carrington, an acquaintance of Mr. Bolden, stated that, in November 2009, weeks before Mr. Bolden's murder, Logan suggested they "rob and kill" Mr. Bolden. Mr. Carrington turned down Logan's proposition, telling him "hell no." Melvin Thomas, another acquaintance, stated that, after the murder, Ashby approached him in a CVS parking lot and admitted that he and his co-appellants had killed Mr. Bolden and placed his body in the southeast quadrant of the city.[3] Mr. Thomas and Ashby spoke again later in 2010, when they were both in the D.C. jail library. Ashby expressed that he was not worried about the case because all of the evidence was "pointing at" Logan, except for Ashby's phone, which was in police custody at the time.[4]

Following the MPD's investigation into the murder and the shooting, Appellants were charged with five crimes related to the killing of Mr. Bolden:

---

[3] Mr. Thomas stated that Mr. Carrington approached them about five minutes into this conversation. Mr. Carrington stated that, while he was present in the CVS parking lot, he "stayed back . . . out of respect" and could not overhear the conversation.

[4] Appellants appeal the admission of these statements, discussed in more detail below. See section II.C., *infra*.

> (1) conspiracy to kidnap and rob, in violation of D.C. Code §§ 22-1805a, -2001, and -2801;
>
> (2) first-degree premeditated murder while armed and felony murder while armed, in violation of D.C. Code §§ 22-2101 and -4502; and
>
> (3) kidnapping while armed, in violation of D.C. Code §§ 22-2001 and -4502, and robbery while armed, in violation of D.C. Code §§ 22-2801 and -4502.

They were also charged with three crimes related to the shooting of Ms. Daniels:

> (1) assault with intent to kill while armed, in violation of D.C. Code §§ 22-401 and -4502 ("AWIK");
>
> (2) aggravated assault while armed, in violation of D.C. Code §§ 22-404.01 and -4502; and
>
> (3) mayhem while armed in violation of D.C. Code §§ 22-406 and -4502.

They were additionally charged with seven counts of possession of a firearm during a crime of violence or dangerous offense ("PFCV"), in relation to the above offenses, in violation of D.C. Code § 22-4504 (b).

Appellants were tried together. At the conclusion of a month-long jury trial in mid-2013, the jury convicted and the judge sentenced as follows.[5]

---

[5] The Honorable Russell F. Canan presided over the pretrial motions in this case. The Honorable Herbert B. Dixon, Jr. presided over one day of pretrial matters, the trial itself – which began on July 2, 2013 and concluded when the verdict was read on August 7, 2013 – and sentencing. Ashby and Logan were sentenced on April 4, 2014, and Watson was sentenced on May 16, 2014.

(i) Logan was found guilty of:
   a. Conspiracy to kidnap or rob Carnell Bolden;
   b. First-degree felony murder while armed of Carnell Bolden;
   c. Kidnapping while armed of Carnell Bolden;
   d. Armed robbery of Carnell Bolden;
   e. Three counts of PFCV for the above convictions other than conspiracy related to Carnell Bolden (first-degree felony murder, kidnapping, and armed robbery of Carnell Bolden);
   f. One additional count of PFCV (first-degree premeditated murder or second-degree murder of Carnell Bolden), despite the fact that he was not convicted of the predicate offense of first-degree premeditated murder or second-degree murder of Carnell Bolden;
   g. AWIK of Danielle Daniels;
   h. Aggravated assault of Danielle Daniels;
   i. Mayhem while armed with respect to Danielle Daniels;
   j. Two counts of PFCV for AWIK and aggravated assault related to Danielle Daniels.

   Logan was sentenced to life in prison.

(ii) Ashby was found guilty of:
   a. Conspiracy to kidnap or rob Carnell Bolden;
   b. First-degree felony murder while armed of Carnell Bolden;
   c. First-degree premeditated murder while armed of Carnell Bolden;
   d. Kidnapping while armed of Carnell Bolden;
   e. Armed robbery of Carnell Bolden; and
   f. Four counts of PFCV for the above convictions other than conspiracy (first-degree felony murder, first-degree premeditated murder, kidnapping, and armed robbery of Carnell Bolden).

   Ashby was acquitted of all the charges related to Danielle Daniels. He was sentenced to ninety years in prison, with a mandatory minimum of thirty-three years.

(iii) Watson was found guilty of:
   a. Conspiracy to kidnap or rob Carnell Bolden;
   b. First-degree felony murder while armed of Carnell Bolden;
   c. Kidnapping while armed of Carnell Bolden;
   d. Armed robbery of Carnell Bolden;
   e. Three counts of PFCV for the above convictions other than conspiracy (first-degree felony murder, kidnapping, and armed robbery of Carnell Bolden); and
   f. One additional count of PFCV (first-degree premeditated murder or second-degree murder of Carnell Bolden), despite the fact that he was not convicted of the predicate offense of first-degree premeditated murder or second-degree murder of Carnell Bolden.

Watson was acquitted of all the charges related to Danielle Daniels. He was sentenced to seventy-three years in prison, with a mandatory minimum of thirty-three years and five years supervised release.

All three appellants appealed their convictions, and each appellant makes various arguments on appeal. We address them in turn below.

## II. ANALYSIS

### A. Alleged *Brady* Violations and Sanctions

Logan and Watson both contend that the government committed *Brady* violations by failing to disclose certain evidence ahead of trial.[6] Specifically, they argue that the government failed to timely disclose that Mr. Bolden's bank card had been used in the days after the murder, and that, at some point thereafter, the prosecution lost an unexamined CD-ROM containing video that the police had obtained from a BP gas station, one of the locations where the card was allegedly fraudulently used.[7]

---

[6] *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."); *see also Andrews v. United States*, 179 A.3d 279, 286 (D.C. 2018) ("The government's obligation to disclose material evidence favorable to the accused arises from the Due Process Clause's purpose of preventing miscarriages of justice." (citing *Brady*, 373 U.S. at 87)).

[7] Logan and Watson make two additional claims unrelated to the bank card.

Logan asserts that the MPD failed to disclose that two men had been stopped near the location where the body was found in southeast D.C., following a report of shots fired. However, Logan offers no details or argument as to how this prejudiced the defense, and it is unclear which men Logan's brief is referencing. In any event, this information was insignificant at best, since the body was found

(continued…)

Following the murder, the decedent's family informed Detective Anthony Greene that Mr. Bolden's debit card "appeared to have been used on December 30th and after." On January 14, 2010, Detective Greene obtained transaction records from Chevy Chase Bank, which revealed that there were four debit card transactions on January 1, 2010, followed by five additional transactions on January 12 at a Wal-Mart, a convenience store, and a Chinese buffet in Sanford and Cameron, North Carolina. One of the January 1 transactions was $72.15 charged to "New York BP Washington DC" at approximately 7:28 p.m. Detective Greene identified the likely location as the BP Gas Station at 1231 New York Avenue, N.E., Washington, D.C., because there was "no other" BP gas station on

---

(…continued)
several hours after the murder took place. While two men were also stopped near the scene of the shooting in the northwest quadrant of the District, this information was likewise of minimal value because the men did not match the description of the shooter and they were stopped sometime after the incident.

Watson contends that the trial court improperly denied his request to exclude certain identification testimony following the government's untimely disclosure of out-of-court identification procedures. While Watson correctly notes that the court admonished the government for failing to disclose earlier its plans for in-court identification, the court allowed the government's witnesses to identify appellants because continuances had already been granted in favor of the defense and because the prosecution proffered that the witnesses clearly knew Watson. Thus, there was no issue. Furthermore, Watson did not contemporaneously object when Norlin Washington, one of the government's witnesses, identified him in court.

New York Avenue at the time.  He met with the owner, who could not find a receipt for a $72.15 transaction inside the store, which indicated that the transaction may have taken place outside at the pumps.  There was no outside surveillance footage available, but Detective Greene requested and viewed the in-store surveillance footage for the time period around the transaction while he was at the gas station.

Detective Greene testified at trial that he did not see "anything . . . deemed to be probative" on the footage, but still obtained a copy on a disk, which he brought back to his office.  He also stated that, while he was unsure, he believed that, when he tried to look at it again at the police station, the disk did not work on the computers.  He apparently lost track of it after that.  At the time of his testimony, he had "no idea" where the disk could be found, and had not seen it for "maybe three and a half years."  Detective Greene could not recall if or when he told any of the prosecutors assigned to the case about the missing disk.  He also did not believe that he had ever tried to obtain a second copy.  Detective Greene also failed to realize that the bank statement showed a charge at another gas station ("Casey's BP") until months before the trial, so he did not investigate the possibility of surveillance footage at that location.

None of this information was disclosed to the defendants until December of 2012 (just over six months before trial, which began in July of 2013), at which point the defendants moved for sanctions for *Brady* violations.

In March of 2013, after one of the prosecutors on the case told Detective Greene that the prosecution had disclosed the information about the bank records to the defense, Detective Greene began – for the first time – investigating the North Carolina charges on the debit card. Following that investigation, it was discovered that a Ronald Smith had made at least some of the charges on Mr. Bolden's bank card, including the charges at the Walmart in North Carolina. Mr. Smith was called to testify at trial and admitted during his testimony that he had picked up Mr. Bolden's debit card after finding it on 11th Street, N.W. He testified to using the card to purchase gas for other patrons of nearby gas stations, after which he would collect half the cost from the patron and pocket the money. Mr. Smith also recalled going to North Carolina in early January and using the bank card when he arrived, including at a Chinese buffet and a Walmart.

In May of 2013, the case was before Judge Russell F. Canan, who presided over a pre-trial hearing on the defendants' motions to dismiss or for other sanctions as a result of the prosecution's late disclosure of the debit card information. Judge

Canan found that the failure to disclose this information was a *Brady* violation and "constitute[d] negligence to a gross degree" on the part of the government. At that time, however, Judge Canan found that a dismissal would be too harsh a sanction for the "gross negligence" of the government, particularly because he found that it was not "willful misconduct or bad faith or even done for tactical advantage." Judge Canan also reserved judgment on further sanctions until it became clear how the disclosures "affected the fairness" of the trial. Judge Canan ultimately passed on the discussion of further sanctions to Judge Herbert B. Dixon, who took over the case.

In July of 2013, Judge Dixon heard arguments on sanctions. The government insisted that hefty sanctions from the court were unnecessary because the government had voluntarily provided the defense with "full and complete" discovery on the records and resulting investigation into the missing debit card, and subpoenaed Mr. Smith, whom the government "otherwise probably would not call." The government argued that this assistance offered to the defense, which might not have been necessary if the disclosures had been timely, together with the continuance already granted, were sufficient to remedy any prejudice that might have resulted from the government's delay in disclosing the evidence.

The trial judge agreed that the subpoenaing of witnesses and the continuances had "ameliorated the impact on the defense," but also held that "it probably [had not] really made them whole." Therefore, the court also ordered the government to produce Detective Greene's grand jury material, Washington Area Criminal Intelligence Information Systems ("WACISS") reports, and notes. The government was able to redact information unrelated to the case, including all identifying information, such as names, addresses, relationships, and locations, of witnesses that were not being called in the case. If the government was "very concerned" about releasing additional information for other security reasons, it was permitted to temporarily redact it, pending an official request to do so. The trial judge cautioned the prosecution against unnecessary redactions, saying that if it had "an inkling that the witness might be helpful [to the defense,]" then it should disclose it.

On appeal, Logan and Watson argue that the late disclosure hindered their ability to mount an effective defense at trial.

The failure to disclose constitutes a constitutional violation that justifies reversal if "the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v.*

*Greene*, 527 U.S. 263, 281 (1999). Here, the disclosure of the debit card information, while late, was done early enough to allow for further investigation. This investigation revealed that Ronald Smith had used the stolen debit card, and allowed Mr. Smith to be brought to testify at trial. The only evidence that may have been difficult to obtain at that late stage would have been the videos from the locations where the cards were used, if any videos indeed existed, but the probative value of such videos would have been quite limited, given Mr. Smith's testimony. Logan and Watson were able to make full use of all of this information in their closing statements, making note of the defense's inability to discover Mr. Smith's involvement until later in the case, and linking the use of the debit card to Mr. Smith's involvement in the drug trade. Therefore, there is little reason to believe that an earlier disclosure would have produced a different result for appellants.

The trial judge also found, and appellants do not appear to contest, that the failure to disclose was not in bad faith.[8] This failure was grossly negligent, but not on its own a due process violation. Rule 16 of the Superior Court Rules of Criminal Procedure provides that the "range of available sanctions is extremely

---

[8] *Cf. Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) ("unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law").

broad, [with] the only real limitation being that a sanction must be 'just under the circumstances.'" *Koonce v. District of Columbia*, 111 A.3d 1009, 1020 (D.C. 2015) (quoting *Gethers v. United States*, 684 A.2d 1266, 1272 (D.C. 1996)); *see* Super. Ct. Crim. R. 16. The sanctions offered by the judge here were just and appropriately addressed the violation. Appellants were able to use Greene's notes, which were turned over pursuant to the judge's order, to attack Detective Greene's investigatory process and conclusions. The court also granted continuances, which allowed the time to discover the necessary information about the debit cards that appellants went on to use at trial. Furthermore, they were able to present Mr. Smith as an alternative perpetrator – a *Winfield* defense[9] – and use his possession of the cards as a source of reasonable doubt.

Logan and Watson specifically take issue with Judge Dixon's denial of a missing evidence instruction, which they requested to ameliorate the effects of the government's *Brady* violation regarding the bank records and related

---

[9] *See Winfield v. United States*, 676 A.2d 1 (D.C. 1996) (setting forth the "standards governing the admissibility of evidence proffered by a criminal defendant that another person or persons committed the crime alleged"). See section II.D.i, *infra*.

information.[10]  As noted, the court allowed the defense to make a *Winfield* argument relating to Mr. Smith, who had used Mr. Bolden's bank card, during closing, but it did not give a missing evidence instruction to the jury.  Watson submitted a detailed request to instruct the jury on the government's failure to timely investigate the bank card use, asserting an "impermissible burden" on his ability to mount a defense by way of investigating the bank card use.

We see no reason for reversal based on the denial of the missing evidence instruction.  A party seeking an instruction to the jury regarding missing evidence must show that the evidence is "likely to elucidate the transaction at issue" and "peculiarly available to the party against whom the adverse inference is sought to be drawn." *Tyer v. United States*, 912 A.2d 1150, 1164 (D.C. 2006) (citations and

---

[10]  The government construes Watson's argument on appeal as taking issue not with the trial court's refusal to issue a missing evidence instruction, but rather with the trial court's refusal to issue a *Shelton* instruction, which resembles an adverse inference instruction, *i.e.*, an instruction to the jury to draw an inference that the government thought its case was weak. *See Shelton v. United States*, 983 A.2d 363, 369 (D.C. 2009), *opinion amended on reh'g*, 26 A.3d 216, 26 A.3d 233 (D.C. 2011).  Appellants did request such an instruction at trial.  The government opposed this instruction, but was willing to allow a *Winfield* argument, see section II.D.i, *infra*, regarding Mr. Thomas.  Prior to closing, the trial court stated that there was no justification for a *Shelton* instruction, noting that the failure to disclose "demonstrate[d] the government's view of its case [in regards to] weakness."  Because appellants do not take issue with the denial of the *Shelton* instruction on appeal, the question of whether the trial court erroneously denied a *Shelton* instruction is not before us.

internal quotation marks omitted). We have "recognized several dangers inherent in the use of a missing [evidence] instruction," as it "represents a radical departure from the principle that the jury should decide the case by evaluating the evidence before it." *Id.* (citation and internal quotation marks omitted). We therefore "review the denial of a request for a missing evidence instruction for abuse of discretion," *id.* (citation omitted), bearing in mind that "the trial court retains considerable latitude to refuse to give a missing evidence instruction, where it determines from all of the circumstances that the inference of unfavorable evidentiary value is not a natural or reasonable one." *Id.* at 1166 (citation, internal quotation marks, and brackets omitted).

On this record, we cannot say that the trial court abused its discretion in denying the missing evidence instruction offered by appellants. The remedies employed by the court, described above, were significant and sufficient.

**B. Motions to Suppress Evidence**


i. <u>The Search of 70 W Street, N.W.</u>


Much of the evidence found in the 70 W Street house was obtained during a search conducted on January 11, 2010. Police initially searched the basement apartment pursuant to the consent of Derrick Hill, then obtained a warrant and searched the rest of the premises. Logan moved to suppress this evidence before trial, but the motion court denied the motion and admitted the evidence on the grounds that the search was legal, finding that Mr. Hill had actual or apparent authority to consent to the search. Logan now challenges this ruling on appeal.


As noted, Mr. Hill had been living in the basement of the 70 W Street house in 2009. Around early November, Ms. Williams, speaking for Logan, had asked for Mr. Hill's front-door key, which Mr. Hill returned, though he kept his key to the back door, which provided direct access to the basement. After Mr. Hill returned the front-door key, he stopped spending the night at 70 W Street, but kept most of his belongings in the basement, including "multiple TVs, bed, the whole nine," and was present in the house often. He would always be let into the front

door after knocking, and he went to the house "every day" to check on his things and would stop by to simply "chill."

In the very early morning hours of January 1, 2010, MPD detectives Joshua Branson, Norma Horne, and James Wilson went to 70 W Street to investigate the nearby shooting of Ms. Daniels and spoke to Logan. When they informed Logan that they were looking for Mr. Hill, Logan responded that Mr. Hill "did live at the house, but he was not home." Logan invited the police inside and retrieved Ms. Williams from upstairs, at which point they told the police that "[Mr. Hill's] room was downstairs" and showed them to the basement to allow them to look around.

In the basement, the police could see through an open door that there were "extension cords just strewn about." Since the detectives had been present for the autopsy of Mr. Bolden's body, they were aware that electrical cords had been used in the course of the murder and transport. Detective Branson testified at the pretrial suppression hearing that it was at this point that he began to suspect that Mr. Bolden's murder may be connected to the house. Upon their request, Logan voluntarily went with two of the detectives back to the homicide unit to answer questions about Mr. Hill. At the station, the officers arrested Logan when they discovered there was an outstanding unrelated warrant for his arrest. That same

day, the officers also obtained and executed a search warrant for the basement at 70 W Street, where they photographed the scene and seized a television with a missing electrical cord.

On January 4, 2010, Mr. Hill talked to the police, and then went with Detective Greene to 70 W Street to retrieve some of his belongings from the basement. However, the back-door key did not work when Mr. Hill tried to open the door because of an interior latch; later that day, Mr. Hill called Mr. Adams, the owner of the home, who told him that he would remove the latch for him.

On January 11, 2010, Mr. Hill returned to the house and was able to open the unlatched back door with his key. When he found one of his own jackets covered in blood, he called Detective Greene, who arrived twenty minutes later and met Mr. Hill outside. Mr. Hill let Detective Green and Detective Wilson into the house through the open back door and showed them the bloody jacket among his personal items in the basement. Mr. Hill then provided consent for the police to take the jacket as evidence and to search for other items in the basement, signing a written consent form.

In the course of the January 11 search of the basement, MPD officers saw blood on the wall, which they swabbed, and Detective Wilson spotted, in plain view, a bin with duct tape similar to the tape that had been found on Mr. Bolden's body, which they seized.[11] At that point, the detectives decided to obtain another search warrant for the entire house; they obtained the warrant and searched the rest of the premises the same day.

Logan argues that the January 11 search of the basement was a warrantless and illegal search because Mr. Hill did not have authority to consent to it. He argues that Mr. Hill was "evicted" in the fall of 2009, at which point he stopped sleeping at the house and surrendered his front-door key, and that, while Mr. Hill retained a key to the back door, he would gain entry primarily by knocking on the front door and waiting for Logan or Ms. Williams to admit him. Logan also argues

---

[11] The plain view doctrine provides that, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *West v. United States*, 100 A.3d 1076, 1083-84 (D.C. 2014) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)). As discussed in this subsection, the facts show that the detectives were lawfully in the basement, so they were permitted to seize the duct tape, as its incriminating character was immediately apparent, given its similarity to the tape that had been found on Mr. Bolden's body.

that none of the investigating officers knew exactly how Mr. Hill had gained access on January 11. These arguments are not persuasive.

A warrantless search will not violate the Fourth Amendment to the Constitution if the police obtained appropriate consent to search the premises from either the defendant or a third party who "possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." (*Cleveland*) *Wright v. United States*, 608 A.2d 763, 766 (D.C. 1992) (quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974)). Moreover, under the doctrine of apparent authority, a consensual warrantless search is valid based on "a police officer's reasonable belief that the person consenting to the search had the authority to do so." (*Cleveland*) *Wright v. United States*, 717 A.2d 304, 307 (D.C. 1998); *see also Illinois v. Rodriguez*, 497 U.S. 177 (1990) (search based on third-party consent valid if officer reasonably believes third party has such authority, even if facts developed later show the contrary).[12]

---

[12] *See also Welch v. United States*, 466 A.2d 829, 845 (D.C. 1983) (whether the individual who provided consent had common authority is "factual in nature (based as it is on concepts of mutual use and joint access)"; therefore, "we may not reverse this finding on appeal unless it is clearly erroneous").

The facts credited by the motion court established that, by January 11, Detective Greene had understood from his conversations with Mr. Hill that Logan had asked Mr. Hill to move out of the house, but that Mr. Hill had been allowed to keep his belongings in the basement and went to the house almost every day to visit and check on his things. Detective Green had also understood that Mr. Hill was supposed to move his belongings out by January 1. As noted above, however, Logan had told the other detectives on January 1 that Mr. Hill did live at the house but was not home, and, as Detective Green knew, Logan had been jailed that same day. Finally, Detective Green had understood that, since January 1, Mr. Hill had been in touch with Mr. Adams, the owner of the house, and Mr. Adams had given him access to the house – including after Mr. Hill was not able to get in on January 4. Thus, when Detective Greene arrived at the house on January 11, he was aware of Mr. Hill's history and relationship with the premises, and his understanding was that Mr. Hill was there with the permission of Mr. Adams, the owner of the house. It was clear that Mr. Hill had already been in and out of the basement that day, and the door was open. The police could therefore reasonably infer that Mr. Hill had gained entry by coordinating with Mr. Adams when he invited them into the basement, where he had found his bloody jacket. Indeed, Detective Greene testified that he had no suspicion whatsoever that Mr. Hill lacked the authority to properly consent to their entry into the basement.

Accordingly, we find that the trial court did not err in holding that the search of the 70 W Street basement was not unconstitutional because Mr. Hill had authority to consent to it. While Mr. Hill was no longer residing in the basement in the traditional sense of the word, as he was not staying overnight there, his relationship to Logan, Mr. Adams, and the premises was sufficient to give him authority over the basement and therefore actual authority to consent to the search.[13] Yet, even assuming arguendo that Mr. Hill did not have actual authority due to the ambiguity of his status as a tenant at that point, he undoubtedly had apparent authority over the basement, as the evidence established that a police officer in Detective Greene's position and with Detective Greene's knowledge of

---

[13] For instance, assuming that Mr. Hill was, by January of 2010, not a resident but a "guest" in the basement of 70 W Street, N.W., he was, by all indications, one with "substantially more authority over the premises than [an] occasional user," and he could be "considered to be in charge of the premises." Wayne R. LaFave, Search And Seizure: A Treatise on the Fourth Amendment § 8.5 (5th ed.). This is particularly so because Logan was incarcerated at the time, no one else was living in the basement, and Mr. Adams had allowed Mr. Hill to continue using the basement, storing his things there, and returning there frequently. Moreover, Mr. Hill was "more than a casual visitor," as he "had the run of the [basement apartment]" and he had invited the police there. *Id.* He was "actually present inside the premises at the time of the giving of the consent and the consent [wa]s merely to a police entry of the premises into an area where a visitor would normally be received" – and thus the "police were entitled to assume without specific inquiry as to [his] status that one who answers their knock on the door has the authority to let them enter." *Id.*

the situation could reasonably believe that Mr. Hill had common authority over the basement and therefore the authority to consent to the police officers' entry and search.

We note that this case is distinguishable from other cases in which courts have found that apparent authority did not exist. For instance, indication of forced entry has disallowed the police from reasonably believing the individual had consent to search.[14] In the present case, the police did not need to gain entry forcibly, as Mr. Hill had already been inside the house when he discovered the blood on his jacket and then called the police and invited them in. We have also noted that an individual cannot consent to the search of a co-inhabitant's space where it is "set aside for . . . private use." *Welch*, 466 A.2d at 845 (citation omitted). Here, however, Mr. Hill only consented to the search of the basement, where he kept his belongings and found his own jacket covered in blood. The

---

[14] Where a mother consented to a police search of a locked footlocker in her son's room, but she did not have a key and the police had to force open the footlocker, the court held that the consenting party did not have authority to consent to the search. *United States v. Block*, 590 F.2d 535 (4th Cir. 1978) (cited in (*Cleveland*) *Wright v. United States*, 717 A.2d 304, 308 (D.C. 1998)); *see also Harris v. United States*, 738 A.2d 269, 274 n.7 (D.C. 1999) (evidence in the record supported a finding of actual or apparent authority to enter the home where the police did not enter forcibly, but were instead let into the apartment by a third party).

police did not attempt to search the remainder of the house, where Mr. Hill presumably lacked authority to consent (because it would likely be considered Logan's private space), without first obtaining a warrant. We therefore discern no error in the trial court's denial of the motion to suppress this evidence.

### ii. Ashby's Cell phone Records

Ashby contends that the call records and cell site location information related to his cell phone, which were used to track his location the night of the murder, as well as whom he was in contact with, should be suppressed as the fruits of an illegal search of his phone. While the investigation into the murder of Mr. Bolden was proceeding, Ashby was arrested on January 11, 2010 on an unrelated charge. He was taken into custody, and his cell phone was seized incident to arrest. Detective Greene used Ashby's cell phone to call his own cell phone twice, Detective Wilson's phone once, and the police department's homicide desk, all while the cell phone was in police custody. Detective Greene testified that he used Ashby's phone to call his own phone in order to obtain the phone number

associated with Ashby's phone. The MPD later obtained warrants that allowed them to access the call records and cell site location information used at trial.[15]

Ashby made a mid-trial motion to suppress the cell phone evidence, which the trial court denied, as it found no Fourth Amendment violation in the detective's conduct. On appeal, Ashby argues that this cell phone evidence was the "only evidence connecting Ashby to the charged crimes" – aside from Mr. Thomas' testimony, discussed in section II.D below – and, because the police could not have obtained this information without Ashby's phone number, it is fruit of the illegal search. The government argues, in part, that the phone calls used to obtain the phone number did not constitute a prohibited invasive search, but rather a permissible search incident to arrest.

The Supreme Court has held that, even when a cell phone is seized incident to arrest, a search warrant is required to conduct a search of the digital contents of

---

[15] An FBI cell phone tower location expert testified to Ashby's location based on which cell phone tower the call utilized. Though Ashby challenges the MPD's use of his cell phone while he was in custody, he does not challenge the use of the location information, which the MPD obtained through a warrant issued on January 26, 2010. We note that the Supreme Court recently held that cell phone tower data could generally not be obtained by law enforcement without a warrant. *Carpenter v. United States*, 138 S. Ct. 2206, 2221 (2018).

that phone because of the "vast quantities of personal information" available on a modern cell phone. *Riley v. California*, 134 S. Ct. 2473, 2485 (2014). However, the Court has expressly allowed for manipulation of a cell phone and removal of the battery to prevent remote access to potential evidence, and has limited the prohibition on warrantless searches to the "digital data" contained on the phone. *Riley*, 134 S. Ct. at 2485. A physical search of the cell phone itself for identifying features is a permissible search incident to arrest, as it does not invade the "immense storage capacity" of the digital device. *Id.* at 2488.

In this case, the information that Ashby challenges, such as call records and cell site location information, were obtained pursuant to validly issued search warrants – and Ashby's phone number was not used to obtain those warrants. In his January 22 application for a warrant for Ashby's cell phone, Detective Greene included only a description of the phone, not the phone number[16] – and relied on

---

[16] The warrant application referred to a "black and silver Motorola Boost [] cell[]phone," and included the International Mobile Equipment Identity/Identifier ("IMEI") number and Subscriber Identity/Identification Module ("SIM") number. While the record does not indicate exactly how Detective Greene obtained the IMEI and SIM numbers, they were presumably viewable by removing the back of the phone and looking at the numbers printed on the interior hardware. *See, e.g.*, Fed. Commc'n Comm'n, Protect your Smart Device (March 28, 2018), https://www.fcc.gov/consumers/guides/protect-your-mobile-device ("the [IMEI] . . . is usually found in your device settings or printed on a label affixed to your

(continued…)

the facts that had emerged from the police investigation up to that point to articulate why Ashby was a suspect and why searching his cell phone would be helpful to the investigation. The January 22 warrant permitted the MPD to legally obtain the digital contents of the phone, including the phone number, call log, and other information – and the phone number and call records were, in fact, obtained using this warrant.[17] On January 26, the MPD applied for another warrant – this time making use of the phone number obtained using the last warrant – and obtained a warrant that allowed them to access the cell site location information.

On this record, it is clear that the detective's effort to physically examine and obtain identifying information for the cell phone was a permissible warrantless search incident to arrest. While *Riley*, 134 S. Ct. at 2485, does not specifically address a scenario in which a police officer makes phone calls from the suspect's phone, as was done here, this is ultimately immaterial, as the phone number was

---

(…continued)
device underneath the battery."). This would appear to be a physical manipulation of the phone that is permissible without a warrant under *Riley*, 134 S. Ct. at 2485.

[17] Ashby argues that the January 22 search warrant is outside the appellate record and cannot be considered because it was not presented at trial. However, we granted appellee's motion for the Court to take judicial notice of these Superior Court Records. *See S.S. v. D.M.*, 597 A.2d 870, 880 (D.C. 1991) (the court may "take judicial notice of the contents of court records."); D.C. Code § 17-305 (2012 Repl.) (the appellate court "shall review the record on appeal").

not used to obtain the January 22 warrant, and the search conducted pursuant to the January 22 warrant independently yielded the phone number. Thus, even assuming arguendo that there were a poisonous tree, that tree bore no fruit, as nothing was done with Ashby's phone number after Detective Greene first obtained it. Indeed, the phone number was all but irrelevant in the first instance, as the cell phone was already in police custody, so there was no question about how to locate the device or which device to search once the warrant was obtained. The evidence that was obtained as a result of the January 22 and January 26 warrants was therefore not the result of an "exploitation of . . . illegality" and did not require suppression. *Hicks v. United States*, 705 A.2d 636, 639 (D.C. 1997). We thus find no Fourth Amendment violation and do not disturb the trial court's holding.

## C. Admission of Out-of-Court Statements

### i. Statements Against Penal Interest

Logan and Watson argue that government witness Melvin Thomas' testimony included hearsay statements from two separate conversations he had with appellant Ashby that were improperly admitted against them.

Mr. Thomas and Ashby spoke in a CVS parking lot in early January 2010 and then again in the library of the D.C. jail on July 16, 2010. Mr. Thomas testified at a pretrial hearing that, while in the CVS parking lot, Ashby approached Mr. Thomas and "started explaining the story." Ashby told Mr. Thomas "it was all [Logan's] idea. I told [Logan], man, don't do that shit in this house," referencing the 70 W Street house and the murder of Mr. Bolden. Mr. Thomas also stated that Ashby described the shooting of Ms. Daniels; Mr. Thomas described his reaction to this as: "then you are going to shoot an innocent bystander that was sitting there and don't know shit from bean dip, just sitting there, waiting . . . ." After the pretrial hearing, the court held that Ashby's statements in both the CVS parking lot and the jail library were admissible under the *Laumer* hearsay exception for admissions against a person's penal interest. *Laumer v. United States*, 409 A.2d 190, 199 (D.C. 1979) (en banc).

At trial, Mr. Thomas testified that Ashby admitted that he had "choked [Mr. Bolden] . . . or knocked him out in the basement" of "Ted's house," referring to Logan's house. Mr. Thomas also testified that Ashby had told him that the attack was "Shorty's idea," referring to Logan. The end of this conversation was overheard by John "John-John" Carrington, another government witness. During the D.C. jail conversation, Ashby told Mr. Thomas that, once Mr. Bolden was

unconscious, Ashby and Watson took him to the southeast part of the city in a car of unknown ownership. Ashby also told Mr. Thomas that they did not get any money off of Mr. Bolden and that Watson helped Ashby "wrap the body up." Mr. Thomas testified that Ashby did not think the police had any evidence against Ashby and all the evidence was "pointing at" Logan. The only evidence Ashby believed the police had against him was, as he told Mr. Thomas, a phone call made "up northwest on W Street," which Ashby did not believe to be incriminating, because his brother owned property in the area. Ashby also told Mr. Thomas that Ashby's lawyer had spoken to "John-John" and asked Mr. Thomas if he knew John-John's real name or where he was located, to which Mr. Thomas responded in the negative. Mr. Thomas testified that he believed Ashby intended to "hit [Mr. Carrington's] head" if he found him.

On appeal, Logan and Watson contend that the court should have found Ashby's statements to be an unreliable attempt to shift blame away from himself and onto his co-conspirators. Watson also argues that such statements should not have been admitted against him, as they were not made in furtherance of the conspiracy.

"Hearsay is an out-of-court assertion of fact offered into evidence to prove the truth of the matter asserted." (*Damion M.*) *Jones v. United States*, 17 A.3d 628, 632 (D.C. 2011). Such a statement is not admissible unless it is "not offered at trial to prove the truth of the matter asserted [and therefore] not hearsay," or it falls under another exception to the rule against hearsay. *Id.* A "determination of whether a statement falls under an exception to the hearsay rule is a legal conclusion, which we review de novo." *Dutch v. United States*, 997 A.2d 685, 689 (D.C. 2010). "However, we will not disturb the factual findings supporting the court's conclusion unless they are clearly erroneous." *Thomas v. United States*, 978 A.2d 1211, 1225 (D.C. 2009).

One exception to the hearsay rule is a statement made against penal interest, which "at the time of its making . . . so far tended to subject the declarant to . . . criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." *Thomas*, 978 A.2d at 1227 (quoting Fed. R. Evid. 804(b)(3)). When statements fall under this exception, they may be properly admitted "without redaction against the non-declarant defendants." *Thomas*, 978 A.2d at 1225. In *Laumer*, this court held that, in order to determine whether a statement constitutes a statement against penal interest, the court must "ascertain (1) whether the declarant, in fact, made a statement; (2)

whether the declarant is unavailable; and (3) whether corroborating circumstances clearly indicate the trustworthiness of the statement." *Laumer*, 409 A.2d at 199.

In this case, the trial court set forth this analysis exactly. It found that (1) Mr. Thomas' testimony that Ashby made the statements was credible, and (2) Ashby was unavailable to testify because he asserted his Fifth Amendment privilege. It then found that (3) the statement in the CVS parking lot was trustworthy because: (a) Thomas and Ashby had known each other for twenty years; (b) the statements were made days after the homicide; and (c) the information in the statements matched details of the case, such as where the body was found and the fact that Ms. Daniels was in a car. It also found that (3) the statement in the jail library was trustworthy because of: (a) the relationship between the two men; (b) the corroborating evidence that the two were in the library together at the time; (c) the connection to the earlier CVS conversation; and (d) the corroborated facts that were contained in the statements, such as the use of duct tape to bind the victim, the DNA evidence at the crime scene and in Logan's car, and the phone records that matched the call to which Ashby referred.

When analyzing the third step – whether corroborating circumstances clearly indicate the trustworthiness of the statement – the court should consider "the time

of the declaration and the party to whom it was made; the existence of extrinsic evidence in the case corroborating the declaration; and – the fundamental criterion – the extent to which the declaration was 'really against the declarant's penal interest' when it was made." *Thomas*, 978 A.2d at 1228 (quoting *Laumer*, 409 A.2d at 200). The statements in the CVS parking lot were made in early January, shortly after the murder, which lends credibility. *Laumer*, 409 A.2d at 200 ("declarations made shortly after the crime for which an accused is charged are often more reliable than those made after a lapse of time."). While the jail conversation took place in July, "the mere fact that the declaration was made after a lapse of time does not [i]n and of itself render the statement unreliable." *Laumer*, 409 A.2d at 201; *see, e.g., Walker v. United States*, 167 A.3d 1191, 1210-11 (D.C. 2017) (statement made two months after the crime is not unreliable where other factors – such as a close relationship between the declarant and the witness and other corroborating circumstances – are present). Furthermore, as pointed out by the trial court, this statement is more reliable considering Ashby discussed the same matter with Mr. Thomas earlier in the year.

There were extensive corroborating circumstances to support Mr. Thomas' account of the events. Ashby's story, as told to Mr. Thomas, matched the other evidence presented in this case. In the D.C. jail, Ashby told Mr. Thomas that the

only evidence against him was the phone call that he placed in the neighborhood, a fact that was corroborated by the prosecution's evidence that, on the night of the murder, there were five incoming and five outgoing calls to and from Watson's phone, and one incoming and two outgoing calls to Logan's phone. Ashby also said that Watson was involved, which matches up with the false 911 call made from Watson's phone at the time. In addition, Ashby's knowledge of where the body was taken was corroborated by Ashby's later protestation that he did not "throw nobody in the woods" prior to being told where the body was found.

Watson and Logan argue that these statements were "blame shifting" on Ashby's part, since he discussed Logan and Watson's involvement, and therefore the statements do not qualify as statements against penal interest. Where a declarant implicates others as well as himself, the Supreme Court has said "[t]he fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts." *Williamson v. United States*, 512 U.S. 594, 599 (1994). Therefore, we have held that "the trial court must assess each component remark for admissibility as a statement against penal interest, rather than base its ruling on the overall self-inculpatory quality of the declarant's narrative in its totality." *Thomas*, 978 A.2d at 1229.

Here, the court, as explained above, did examine each of the statements in turn, looking first at the statement made in the CVS parking lot and finding it credible for the reasons explained above. Next, the trial court considered the time elapsed between the murder and the conversation at the D.C jail, and still found it to be credible. While some of Ashby's statements may seem as if he was attempting to shift the blame to Logan, this is not a situation wherein Ashby could be looking to escape liability, as he was not being interrogated by the police, nor did he ever think he would get caught. Moreover, these statements are in no way "neutral" to Ashby, as he admitted to committing the actual murder, implicating Logan as part of a conspiracy that, if discovered, would only heighten the potential jeopardy for Ashby. *See Thomas*, 978 A.2d at 1229. If anything, it appears from the totality of the circumstances that Ashby felt free to tell the truth to a friend he had known for over twenty years.

Finally, Logan and Watson argue that the court should have declined to admit hearsay statements from Mr. Thomas because he was an unreliable witness – one who offered testimony not because it was truthful, but in an attempt to shift the blame away from himself and curry favor with the prosecution. Yet, as noted above with respect to the first prong of the *Laumer* analysis – whether the statement was actually made – the court must "assess the general credibility of the

witness and probe for interest, bias, and the possible motive for fabrication."
*Laumer*, 409 A.2d at 199. For the reasons discussed, the trial court conducted a detailed analysis and found Mr. Thomas' testimony credible. We do not find Mr. Thomas' motives for lying to be so compelling as to mandate a reversal of the trial court's decision here.

We discern neither clear error in the factual findings nor errors of law in the trial court's conclusions, and we therefore do not disturb its holdings regarding statements against penal interest.

ii. The State-of-Mind Exception

Watson challenges a statement that was admitted under the exception to the hearsay rule that permits statements introduced "'for the limited purpose of showing the state of mind of the declarant' if the declarant's state of mind is at issue in the trial."[18] *Jones*, 17 A.3d at 632 (quoting *Evans-Reid v. District of Columbia*, 930 A.2d 930, 944 (D.C. 2007)). During a pretrial hearing, government witness John Carrington identified Logan in court and testified that, prior to Mr.

---

[18] Logan does not challenge the admission of these statements on appeal.

Bolden's murder, Logan asked Mr. Carrington "to rob Dink and kill him," referring to Mr. Bolden as "Dink." Mr. Carrington said that, after he refused, Logan "said he would have his man, Tiger [Ashby,] do it." The court ruled that it would allow this testimony from Mr. Carrington under the state-of-mind exception to the hearsay rule, though it instructed counsel that the statement must be redacted to omit any reference to Ashby ("Tiger").[19]

This statement, as edited by the trial court, meets the requirements of the state-of-mind exception. In the past, we have held that a declarant's expression of an intent to do harm to the victim is relevant to state of mind, where the government has the burden of showing an intent to commit the crime. *See, e.g., Rink v. United States*, 388 A.2d 52, 55-56 (D.C. 1978) (declarant's threats towards the victim are admissible to establish declarant's malice aforethought in a second-degree murder trial). Here, in order to secure a conviction for felony murder, the government had to show "intent to commit the underlying felony." *Waller v. United States*, 389 A.2d 801, 807 (D.C. 1978). Logan's statements reveal an intent to rob and kill Mr. Bolden, actions which are both at issue in this case. Where

---

[19] The trial court also instructed that the statement be redacted to omit reference to Logan committing the crime with "other people," though Mr. Carrington included this portion of the statement in his testimony at trial, appellants did not object, and the court did not intervene.

hearsay statements have "a highly prejudicial nature," they must be excluded, even if they are probative and fall under this exception. *Clark v. United States*, 412 A.2d 21, 27 (D.C. 1980). This statement, however, was not so prejudicial as to be barred. Mr. Carrington recounted Logan's statement about killing Mr. Bolden, but did not mention Watson or Ashby, as there was no reference to Watson in the first place and the reference to "Tiger" (Ashby) was redacted. Thus, the jury was not told who Logan's accomplices may have been, and would have had to infer, based on other evidence, the extent of Watson and Ashby's involvement.[20]

Additionally, Watson contends that, because Logan's state of mind would not have been at issue if Watson had been the only defendant at trial, the statement should not have been admitted against him, even in a trial where all three appellants were tried together. However, the court provided this limiting instruction to the jury, which was sufficient to ameliorate any prejudice to Watson:

---

[20] This is not unlike our ruling in *Baker v. United States*, where the admitted statement of future intent was harmless because it was "vague and cumulative . . . . The statement itself offer[ed] only an imprecise notion that Baker, along with unnamed and unenumerated others" planned to commit a crime. *Baker v. United States*, 867 A.2d 988, 1003 (D.C. 2005). While Logan was clear about the exact crime he planned to commit, the omission of Ashby's nickname made the statement seemingly refer to "unnamed and unenumerated others" that Logan would eventually recruit to join in his plan. *Id.*

> The testimony of John Carrington that Keith Logan made a statement to him or in his presence was offered to prove the state of mind of Defendant Keith Logan. That statement attributed to Mr. Logan was not offered as proof of the state of mind of Defendant Paul Ashby or Defendant Merle Watson and may not be considered proof of the state of mind of Defendant Watson or Defendant Ashby.

*See Thomas*, 978 A.2d at 1232, n.65 (a statement that implicates a co-defendant admitted under the state-of-mind exception entitles the implicated, non-declarant co-defendant to a limiting instruction).

We therefore find no error in the trial court's admission of Mr. Carrington's statement.[21]

---

[21] We note that, while the trial court permitted this statement under the state-of-mind exception to the hearsay rule, it would likely also have been admissible as an opposing party's statement, as such statements include those made by co-conspirators during and in furtherance of the conspiracy. *See, e.g., Harris v. United States*, 834 A.2d 106, 116 (D.C. 2003) (discussing and applying Fed. R. Evid. 801(d)(2)).

iii. Denial of Severance

Watson contends that the trial court erred in denying his motion to sever his case from that of his co-appellants. He moved for severance upon the introduction of the statements against penal interest discussed above, and argues that the trial court abused its discretion in not granting severance, as the statements were not made in furtherance of the conspiracy and were unreliable and prejudicial.[22]

"The disposition of a motion for severance is within the sound discretion of the trial court, and its ruling either way will be reversed only on a showing of an abuse of discretion." *Perez v. United States*, 968 A.2d 39, 76 (D.C. 2009) (quoting *Scott v. United States*, 619 A.2d 917, 930 (D.C. 1993)). Where the government seeks to admit a statement that incriminates the declarant and a co-defendant "the trial court must ordinarily either sever the trials or exclude the statement." *Id.* at 76. However, this court has recognized other ways for a trial court to permissibly avoid prejudice. In *McCoy v. United States*, we held that the trial court's decision to admit a statement was permissible because the statement was "redacted to

---

[22] Watson also contends severance should have been granted because these statements are not reliable. For the reasons discussed in section II.C.i, *supra*, we find this argument to be unpersuasive.

eliminate any reference to [a co-defendant]." (*Edward*) *McCoy v. United States*, 890 A.2d 204, 215 (D.C. 2006). In *McCoy* the trial court also instructed the jury that the statement could only be used against the declarant. *Id.* Moreover, these precautions and severance are unnecessary "if the evidence would be admissible against the defendant in a separate trial." *Perez*, 968 A.2d at 76.

Ashby's statements were properly admitted as statements against interest; as discussed, such statements are admissible when a declarant is unavailable to testify and the statements were made against the declarant's penal interest. Fed. R. Evid. 804(b)(3). First, because Ashby was unavailable to testify due to his assertion of his Fifth Amendment privilege, his statements would have been admissible in Watson's trial, even if Watson had been tried as the sole defendant. Fed. R. Evid. 804(a)(1). Second, like the court in *McCoy*, the trial court here edited Logan's statements to omit any reference to Ashby, and, absent any reference to Watson, they were not so prejudicial as to mandate exclusion, severance, or reversal, as explained above. We thus find no abuse of discretion in the trial court's holding.

**D. *Winfield* Defense and Bias Cross-Examination**

The testimony of Melvin Thomas, discussed above, spanned two days at trial and included not only direct examination by the government, but significant cross-examination by Ashby, Logan, and Watson. All three appellants claim in some manner that the trial court improperly restricted the cross-examination of Mr. Thomas, who they contend testified for the government in an effort to direct suspicion away from himself.

Specifically, appellants assert that the trial judge impermissibly limited proposed lines of questioning regarding: (i) Mr. Thomas' own involvement in the murder of Mr. Bolden, and (ii) Mr. Thomas' involvement in other serious crimes being investigated at the time of the trial, namely, the murder of Terrance McFadden and a heroin operation at Mama's Southern Cuisine, an establishment co-owned by Mr. Thomas and a man named Raymond Proctor. These claims essentially amount to allegations that the trial court erred in (i) prohibiting appellants from portraying Mr. Thomas as a *Winfield* suspect in the murder of Mr. Bolden, and (ii) limiting bias cross-examination.

i. *Winfield* Defense

Under *Winfield v. United States*, 676 A.2d 1 (D.C. 1996), a criminal defendant may attempt to create reasonable doubt regarding his or her guilt by asserting that a witness at trial is, in fact, a suspect – another individual who may be at fault for the crime. In order to present a *Winfield* defense, a defendant must proffer to the trial court a sufficiently detailed explanation that provides context "as to third-party responsibility for a crime [and avoids the] risks [of] misleading the jury by distracting it from the issue of whether *this* defendant is guilty or not." *Id.* at 5 (emphasis in original). This proffer must suggest a "nexus between the proffered evidence and the charged crime" – and the nexus must be more than just a simple motive. *Winfield*, 676 A.2d at 5 (citations omitted). In ruling upon a defendant's proffer, "the trial court should exclude *Winfield* evidence if it is too remote in time and place, completely unrelated or irrelevant to the offense charged, or too speculative with respect to the third party's guilt." *Andrews v. United States*, 179 A.3d 279, 295 (D.C. 2018) (quoting *Turner v. United States*, 116 A.3d 894, 917 (D.C. 2015)). On appeal, "[w]e review a trial court's determination on the admissibility of a third-party perpetrator defense for abuse of discretion, and that determination 'will be upset on appeal only upon a showing of grave abuse.'"

*Melendez v. United States*, 26 A.3d 234, 241 (D.C. 2011) (quoting *Gethers v. United States*, 684 A.2d 1266, 1271 (D.C. 1996)).

In order to support a *Winfield* line of questioning, Ashby provided a factual proffer that stated:

> It's our belief that Mr. Thomas has an extensive heroin operation that essentially ran its course . . . and ended up butting heads with the decedent's operation. Mr. Thomas has a longstanding heroin business centered in LeDroit Park, specifically 70 W Street. We have information about his suppliers, the number of people who ran heroin for him in the area. And we know that in spite of what he says, that he was very familiar with Mr. Bolden and what operations Mr. Bolden had and what success Mr. Bolden had . . . . Although I will not be confronting him on being the actual trigger man . . . . As the Court knows, Mr. Thomas is a convicted murderer . . . .

The trial court recognized that "there's much less of a burden on the defense to make a showing than it is for the government to bring charges against the defendant," but found that the allegations of drug dealing were not sufficient to show a "nexus to the underlying murder." However, based on Ashby's argument at trial that the "drug relationship" between Logan and Mr. Thomas was relevant, the court allowed questioning to establish the "friendship" between Logan and Mr. Thomas.

We find no abuse of discretion in the trial court's holding that *Winfield* evidence was inappropriate as to Mr. Thomas. The evidence proffered against Mr. Thomas was remote, as nothing placed him in the vicinity of the crime or near the victims at any time near the murder, aside from testimony that Mr. Thomas was at 70 W Street on December 24, 2009, six days before the murder. It established that Mr. Thomas likely knew Mr. Bolden at one time and had been convicted of murder in the past, but was totally speculative as to Mr. Thomas' potential involvement in the murder of Mr. Bolden. Since Ashby presented no evidence that Mr. Thomas had a viable reason to harm Mr. Bolden and Ms. Daniels, aside from an inference that Mr. Thomas and Mr. Bolden may have been competitors in the drug trade, there was no evidence of a nexus to the crime.

Ashby contends that the trial court applied the incorrect standard in determining whether this *Winfield* evidence should be admitted, an argument based primarily on the trial court's comment that there was no "triggering event" in the proffer as to what would have prompted Mr. Thomas to commit such a heinous crime. However, the trial court did not require the "exhaustive proffer" that Ashby claims it did; rather, it noted that there was no evidence presented that showed anything other than Mr. Thomas and the victim's willingness to come and go from

70 W Street, trading in drugs. Absent any evidence – even circumstantial evidence – of a connection or motive, the trial court permissibly found that there was no evidence that tended to create a "reasonable possibility" that Mr. Thomas was involved in the crimes. *Winfield*, 676 A.2d at 5 (quoting *Johnson v. United States*, 552 A.2d 513, 516 (D.C. 1989)). We see no reason to upset the trial court's determination on appeal.[23]

ii. Bias Cross-Examination

At trial, the judge allowed extensive bias cross-examination of Mr. Thomas, and precluded it only as it related to (a) heroin dealing at Mama's Southern Cuisine; (b) the murder of Terrance McFadden; and (c) further cross-examination of Mr. Thomas relating to his drug dealing and his involvement in the murder of Mr. Bolden.

---

[23] Ashby also argues that the trial court incorrectly prohibited him from making *Winfield* arguments regarding Mr. Thomas in his closing. However, Ashby's counsel did make remarks in closing arguments implying that Mr. Thomas was involved in the murder. He stated: "Mr. Carrington and Mr. Thomas met together, perhaps in the CVS parking lot, and they came up with a story. And Melvin Thomas' plan was for all of them to say the same story that Paul Ashby confessed to this crime." He also referred to Mr. Thomas as a "puppet master" who "needed Paul Ashby to be the one who is in that chair." There was no objection and the court allowed these arguments to proceed.

First, all three appellants asked for a federal case file on a man called "Pappy," who, together with others, was under investigation for conspiring to import heroin from Guatemala. They stated that the authorities had originally believed Mr. Thomas was "Pappy," based on repeated phone calls between Mr. Thomas and a man named Eric Braxton, but then came to realize that Mr. Braxton, not Mr. Thomas, was "Pappy." Appellants argued mid-trial that they had just learned of these developments, and that they needed access to the case file on the investigation to reveal "what [the government has] on Mr. Thomas and especially what [the file] might reveal that [Mr. Thomas] knows they have." They also argued that they should be permitted to question Mr. Thomas about Mama's Southern Cuisine, which he co-owned with Raymond Proctor, as Mr. Proctor was arrested for selling drugs out of Mama's Southern Cuisine. The court denied these requests, finding appellants' allegations too weak to sustain further exploration.

On appeal, Ashby argues that the court erred in not allowing appellants to explore the "Pappy" investigation further, as this would have shown Mr. Thomas' motive to lie in the trial for Mr. Bolden's murder in order to "curry favor" with the government and avoid suspicion in a drug trafficking case. On a related note, appellants, primarily Watson and Ashby, argue that the court erred by not allowing

them to question Mr. Thomas regarding Mama's Southern Cuisine, as this line of questioning would have shown that Mr. Thomas was biased and provided favorable government testimony to avoid being caught up in the restaurant investigation himself – and would have additionally shown that he was involved in the drug trade in the area.

Second, appellants argue that they should have been permitted to question Mr. Thomas regarding his involvement in the murder of Mr. McFadden. Watson's counsel presented information, based on unnamed witness accounts, that there was a fight outside of Chuck and Billy's Bar, after which Mr. Thomas shot Mr. McFadden and handed the gun off to someone else. However, the trial court found the proffer insufficient, as the defense counsel was not willing to tell the Court any more about the alleged witnesses.

Third, appellants take issue with the trial court's denial of cross-examination pertaining to Mr. Thomas' drug trafficking generally, and how those activities connected Mr. Thomas to the charged crimes. Ashby argued at trial that this information was relevant not just for *Winfield* purposes, but to show that Mr. Thomas had a motive for lying – to conceal his own guilt. Ashby's counsel pointed to the two drug investigations discussed above and alleged that Mr.

Thomas was "a major drug player," who "clearly has an incentive to curry favor with the government." The trial court declined to allow questions about the drug dealing between Logan and Mr. Thomas, but, as noted above, allowed questions about "their friendships" and association.

It is true that the right of the defendants "to present a complete defense . . . includes the guarantee of 'a full and fair' opportunity to show that the government's witnesses are biased.'" *Martinez v. United States*, 982 A.2d 789, 794 (D.C. 2009) (quoting *McDonald v. United States*, 904 A.2d 377, 381 (D.C. 2009)). This court has held that a motive to lie is clear where a witness is under suspicion by the government for another matter and therefore may be motivated to "slant his testimony in favor of the government" to curry favor. *Id.* at 794 (quoting *Beynum v. United States*, 480 A.2d 698, 707 (D.C. 1984)). Furthermore, "the refusal to allow *any* questioning about the facts indicative of bias . . . is an error of constitutional dimension, violating the defendant's rights secured by the Confrontation Clause." *Id.* at 794.

However, this right "is not unlimited"; once meaningful cross-examination has been permitted, "the trial court has broad discretion to impose reasonable limits on cross-examination based on concerns about . . . confusion of the issues . . . or

interrogation that is repetitive or only marginally relevant." *Coles v. United States*, 808 A.2d 485, 489 (D.C. 2002) (quoting *Grayton v. United States*, 745 A.2d 274, 280-81 (D.C. 2000)). Additionally, before a line of bias questioning can be pursued, the proponent must provide "[a]n adequate foundational 'proffer . . . to establish the relevance of a proposed inquiry by facts from which the trial court may surmise that the line of questioning is [in fact] probative of bias.'" (*Ricardo*) *Jones v. United States*, 27 A.3d 1130, 1148 (D.C. 2011) (quoting *Melendez v. United States*, 10 A.3d 147, 152 (D.C. 2010)).

First, the trial court did not err in denying further cross-examination into the drug investigations.[24] The defense was able to present the alleged connection between Mr. Braxton and Mr. Thomas through cross-examination of Mr. Thomas regarding drug-related phone calls and other statements; Mr. Thomas provided testimony about the close relationship between himself and Mr. Braxton, and denied the use of the name "Pappy" in their dealings – a statement that Ashby was

---

[24] As described above, there were two drug-related cases that the defense sought to introduce on cross-examination of Mr. Thomas: the importation of heroin undertaken by Mr. Braxton, or "Pappy," and the drug charges against Raymond Proctor for dealing out of Mama's Southern Cuisine. From the record, it appears that the charges related to Mama's Southern Cuisine were dismissed and then "incorporated" into the heroin importation case, which was a joint FBI-MPD endeavor.

able to impeach with prison phone calls. The defense was also able to question Mr. Thomas about the investigation into the heroin importation. In the past, we have held that it was an abuse of discretion for a trial judge to disallow cross-examination into the investigatory matters which may induce a witness to lie for the government, "without otherwise making or permitting adequate inquiry about the investigation." *Martinez*, 982 A.2d at 795. In this case, however, it is clear that the court allowed "a meaningful degree of cross-examination to establish bias," not only as it pertained to Mr. Thomas' relationship to Mr. Braxton, but also as it pertained to his other motives for lying. *McCray*, 133 A.3d at 232 (quoting *Grayton v. United States*, 745 A.2d 274, 279 (D.C. 2000)).

Second, the court did not err in excluding cross-examination regarding the murder of Mr. McFadden. Watson's counsel was unable to provide sufficient detail in her proffer to the court, telling the court only she had "talked to the individuals that were there" and had "a good faith basis to believe that Mr. Thomas was involved in the homicide." When the court asked for the "factual underpinning of [this] good faith basis," counsel declined to say anything further on the record to justify the cross. Thus, Watson offered what essentially amounts to a rumor that Mr. Thomas was involved in a crime, with no evidence to support this assertion. She also failed to offer any proof that Mr. Thomas was being

investigated for the crime. Thus, there was no reason for the unrelated crime to be introduced during these proceedings.

Finally, the trial court did not err in prohibiting further cross-examination about Mr. Thomas' involvement in the murder of Mr. Bolden. We have long held that there is a "conceptual similarity" between bias cross-examination of a witness and a *Winfield* defense, as bias cross-examination is intended to show that the witness is motivated to lie to divert suspicion away from the true murderer, while a *Winfield* defense is intended to show, through cross-examination, that the witness himself or herself is the true murderer. *Jolly v. United States*, 704 A.2d 855, 860 (D.C. 1997). The defense's burden for obtaining bias cross-examination is relatively low, as it need only show and the court need only find that there are "some facts which support a genuine belief that the witness [was] biased in the manner asserted." *Id.* at 860 (quoting (*Irving J.*) *Jones v. United States*, 516 A.2d 513, 517 (D.C. 1986)). It is within "the discretionary role of the trial court [to] control[] bias cross-examination." *Brown v. United States*, 683 A.2d 118, 124 (D.C. 1996) (quoting *Ford v. United States*, 549 A.2d 1124, 1127 (D.C. 1988)). Moreover, "[b]ias is always a proper subject of cross-examination," *Brown*, 683 A.2d at 124 (quoting (*Irving*) *Jones*, 516 A.2d at 517), because "evidence that the testimony of the key eyewitness to the [crime] might be motivated by his effort to

cover up his own involvement in the [crime], and perhaps to downplay the culpability of his partner in criminal activity, is highly relevant to the jury's assessment of the witness' credibility." (*Louis*) *McCoy v. United States*, 760 A.2d 164, 174 (D.C. 2000).

In this case, the trial court allowed ample inquiry into Mr. Thomas' involvement with appellants and his relationship to the crime. Appellants were permitted to question Mr. Thomas about his involvement in the drug trade generally. The trial court also allowed bias cross-examination as to Mr. Thomas' presence in Logan's house and heroin dealing on December 24, 2009, which was also corroborated in another witness' earlier testimony. The defense was likewise permitted to question Mr. Thomas about his past crimes and his resulting parole status, as well as his previous charges for firearm possession and assault on a police officer. Yet, there was no evidence proffered that he had actually committed the murder of Mr. Bolden himself, beyond a mere speculative claim of guilt by association. Thus, the trial court did not err in prohibiting additional cross-examination, beyond what it had already permitted.

We therefore discern no abuse of discretion in the court's decision to deny additional bias cross-examination on the three issues raised by appellants. We also

find that, even assuming that the trial court was in error, such an error would be harmless beyond a reasonable doubt.

In assessing harmlessness, the mere fact that significant cross-examination had been conducted is, on its own, insufficient to ensure the defendant's constitutional rights were not violated. *See, e.g., Coles v. United States*, 36 A.3d 352, 359 (D.C. 2012). Rather, we must determine "'whether, assuming that the damaging potential of the cross-examination were fully realized, [we] might nonetheless say that the error was harmless beyond a reasonable doubt.'" *Martinez*, 982 A.2d at 796 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). In doing so, we look to "a host of factors," including the importance of the witness' testimony to the prosecution's case, corroboration by other witness testimony, the extent of cross-examination otherwise permitted, and the strength of the prosecution's case. *Id.* (citation and internal quotation marks omitted).

As explained above, ample cross-examination was permitted and undertaken by appellants. The jury had full knowledge of Mr. Thomas' connection to the defendants and other known drug dealers, as well as Mr. Thomas' own involvement with drugs and other crimes. The defense impeached his testimony using his prior grand jury statements. They asked him about his presence in the

house prior to the murder to engage in heroin dealing, and how often he spoke with Logan. The jury was also informed of the consequences that Mr. Thomas was attempting to avoid. As a result of the firearm and assault charges, he had to go in front of the parole board and risked the revocation of his lifetime parole. Appellants asked Mr. Thomas about whether the prosecution had offered to speak on his behalf at the hearing, which Mr. Thomas denied. *See Martinez*, 982 A.2d at 795 ("inquiry into whether a government witness might be facing severe penalties that his testimony might help avert can be an important part of effective cross-examination for bias.") He was also asked about his relationship with Mr. Braxton, and the court allowed the defense to play audio clips of telephone conversations between the two that were recorded while Mr. Thomas was in jail. The defense questioned Mr. Thomas about his tendency to put on a deceptive "act" for others. In sum, there was extensive cross-examination over the course of two days and hundreds of pages of transcript, and the defense was able to provide enough damaging cross-examination that additional cross-examination would have been cumulative.

**E. Sufficiency of the Evidence for the Daniels Shooting Conviction**

Logan, the only appellant to be convicted for the shooting of Ms. Daniels, argues that his convictions must be reversed for insufficiency of evidence. In connection with the shooting of Ms. Daniels, Logan was convicted of assault with intent to kill ("AWIK") while armed, aggravated assault while armed, mayhem while armed, and two counts of possession of a firearm during a crime of violence ("PFCV") – one related to AWIK and one related to aggravated assault.

We have held that, "[w]hen analyzing the sufficiency of the evidence, we view the evidence 'in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence.'" *Medley v. United States*, 104 A.3d 115, 127 n.16 (D.C. 2014) (quoting *Curry v. United States*, 520 A.2d 255, 263 (D.C. 1987)). On appeal, we will not disturb a conviction on grounds of insufficient evidence unless "the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt." *Id.* at 127 (quoting *Zanders v. United States*, 678 A.2d 556, 563 (D.C. 1996)). In order to prove AWIK while armed, "the government had to show beyond a reasonable doubt that [Logan]: (1) made

an assault on [Ms. Daniels]; and (2) did so with specific intent to kill; (3) while armed." *Hagans v. United States*, 96 A.3d 1, 42 n.131 (D.C. 2014) (citing *Nixon v. United States*, 730 A.2d 145, 148 (D.C. 1999)); *see also* D.C. Code § 22-401 (2018 Supp.).

Logan does not contend that the government failed to prove intent to kill or the presence of a gun during the crime; he contends only that the evidence that placed Logan at the scene of the assault was not sufficient to overcome his alibi, which was Diane McCray testifying that Logan was in her apartment at the time. However, the testimonial and physical evidence in the record was more than sufficient to place Logan at the scene.

The evidence showed that the murder of Mr. Bolden was committed in Logan's basement. The month before the murder, Logan asked Mr. Carrington to "rob [Mr. Bolden] and kill him," while Ashby told Mr. Thomas that killing Mr. Bolden in the basement was Logan's idea. Logan called Mr. Bolden twice before the attacks. Physical evidence found in Logan's basement and on Mr. Bolden's body also pointed to Logan being involved in the crime. The cord missing from a TV in the basement was "consistent with" the cord found wrapped around Mr. Bolden's body. Mr. Bolden's blood was found on a jacket and a wall in the

basement. The tape found on Mr. Bolden's body matched the roll found in the basement, and the evidence suggested that the piece found on Mr. Bolden had been ripped from the roll.

The evidence also showed that the shooting of Ms. Daniels was connected to the murder of Mr. Bolden. The last place Ms. Daniels saw Mr. Bolden alive was in close proximity to Logan's house on W Street, and she waited for him in the car for about an hour before she was shot. Ashby told Mr. Thomas that Logan began "tripping when he seen the girl sitting outside in the car" and that Logan started talking about "killing everybody." Ashby also told Mr. Thomas that he (Ashby) and Watson left the house to transport Mr. Bolden's body "southeast," where the body was ultimately found by the police, and the cell tower location information indicated that Ashby's cell phone traveled from the vicinity of W Street, N.W. to the southeast part of the city, where Mr. Bolden was found. Meanwhile, at the time of the shooting, Logan's phone never moved from the area, and an eyewitness saw someone running away from the scene following the gun shots at Ms. Daniels. Thus, there was substantial evidence from which a jury could conclude that Logan was at the scene of the shooting of Ms. Daniels.

Logan contends that he had an alibi: he was with Ms. McCray the whole night. Yet, Ms. McCray herself testified that Logan seemed "disturbed" when he showed up to her house that night, and that she then left to go to the grocery store for "close to an hour." The jury may have discounted Ms. McCray's statement entirely; based on her testimony that she had known Logan for thirty years and that they had "always been close like family friends," the jury could have reasonably concluded that she lied for Logan – and this would be within its province as the finder of fact. *Tann v. United States*, 127 A.3d 400, 430 (D.C. 2015) ("[w]e afford the jury's credibility determination substantial deference on appellate review."). However, even if the jury had credited Ms. McCray's story, there would have been time for Logan to leave her house, commit the crime, and return, unbeknownst to her. Thus, there is no question that, even taking Logan's purported alibi to be true, there was more than sufficient evidence for the jury to place Logan at the scene of the shooting of Ms. Daniels and therefore find that each element of AWIK while armed was satisfied.

## F. The *Pinkerton* Instruction

Ashby also challenges the *Pinkerton* instruction given at trial, arguing that the *Pinkerton* doctrine is not applicable in the District of Columbia because it is

not authorized by statute. The *Pinkerton* doctrine, articulated by the Supreme Court in 1946, provides that co-conspirators can be held liable for the acts of their fellow co-conspirators done in furtherance of the conspiracy. *See Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946) ("[S]o long as the partnership in crime continues, the partners act for each other in carrying it forward. It is settled that an overt act of one partner may be the act of all without any new agreement specifically directed to that act." (citations omitted)). Ashby contends that, because the District's common law does not include any doctrines that were not in existence in 1801, including the *Pinkerton* doctrine, and no statute has been passed to codify this theory of liability, a *Pinkerton* instruction is not allowed in the District.

In 1901, Congress passed the "1901 Code Act," which incorporated into the law of the District the common law and all British statutes in effect in Maryland in 1801, principles of equity and admiralty, and applicable laws of Congress in force in 1901. D.C. Code § 45-401 (2012 Repl.). Yet, "[w]e have held . . . that by incorporating the common law of Maryland . . . Congress did not intend to freeze the common law as it existed in 1801. Rather, Congress meant to incorporate the 'dynamic' common law." (*Robert*) *Williams v. United States*, 569 A.2d 97, 100 (D.C. 1989) (citations and internal quotation marks omitted). This means that, as

we have stated in the past, when the Maryland common law was incorporated into this jurisdiction, it was "not a bar to the exercise of our inherent power to alter or amend the common law." *Williams*, 569 A.2d at 100 (quoting *United States v. Jackson*, 528 A.2d 1211, 1216 (D.C. 1987)). Indeed, our jurisprudence is clear that the *Pinkerton* doctrine has been accepted as part of this jurisdiction's common law. This court has adopted and applied the *Pinkerton* doctrine, and has stated, while sitting en banc:

> As articulated by this court, the *Pinkerton* doctrine provides that "a co-conspirator who does not directly commit a substantive offense may [nevertheless] be held liable for that offense if it was committed by another co-conspirator in furtherance of the conspiracy and was a reasonably foreseeable consequence of the conspiratorial agreement."

*Wilson-Bey v. United States*, 903 A.2d 818, 840 (D.C. 2006) (en banc) (quoting *Gordon v. United States*, 783 A.2d 575, 582 (D.C. 2001)) (brackets in original).

In light of this court's holdings, "the validity of a *Pinkerton* instruction as part of D.C. law" is clearly not "an issue of first impression," as Ashby contends. It is settled law.

The instruction offered in this case, based on the Red Book instruction for conspiracy,[25] was:

> A conspiracy is kind of a partnership in crime. And its members may be responsible for each other's actions. A defendant is responsible for an offense committed by another member of the conspiracy if the defendant was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance and as a natural consequence of the conspiracy.

*See* Criminal Jury Instructions for the District of Columbia 7.102 (Barbara E. Bergman ed., 5th Ed. 2016). This is not unlike instructions that we have quoted and found no error with, such as the instruction that evidence against "one participant in furtherance of a joint criminal venture can be held against another participant, since each participant in a shared venture is responsible as a principal, even though he does not personally commit each of the acts that constitute the offense." (*David*) *Williams v. United States*, 858 A.2d 978, 983 (D.C. 2004).

---

[25] The book of criminal jury instruction for the District is often referred to as "the Red Book." *See* Criminal Jury Instructions for the District of Columbia (Barbara E. Bergman ed., 5th Ed. 2016)

Therefore, we find no error in the trial court's application of the *Pinkerton* doctrine or its jury instruction in the instant case.

## G. The Prosecutor's Closing Argument

Logan alone contends that the prosecutor's closing argument "was improper and should have been corrected by the judge." Logan specifically challenges the prosecution's references to appellants as "hardened killers" and "stone-cold killers," and his statements that the jury must find appellants guilty "in order to make sure that Danielle Daniels' suffering is vindicated, in order to make sure that Carnell Bolden receives a possibility of justice . . . ." Logan contends that, with these comments, the prosecution impermissibly attacked the character of appellants, sought vengeance, and may have led the jury to "impute to [the prosecution] knowledge that had not been set before them." Logan did not, nor does he contend on appeal that he did, preserve this objection to the closing argument at trial, and we therefore review for plain error.[26]

---

[26] *See Ventura v. United States*, 927 A.2d 1090, 1098 n.8 (D.C. 2007) ("The plain error standard generally applies to contentions not raised before the trial court." (citation omitted)); *see also* (*Richard C.*) *Jones v. United States*, 124 A.3d 127, 129 (D.C. 2015) (plain error review is a "rigorous standard" that requires an appellant to show that the trial court's action "was (1) error, (2) that is plain, (3)

(continued…)

We have observed that the government may prosecute its case "with earnestness and vigor." *Perez*, 968 A.2d at 82 (quoting *Irick v. United States*, 565 A.2d 26, 36 (D.C. 1989)). While a prosecutor "should not express his or her opinion on the ultimate issues in the case to the jury during closing argument," *Sherrod v. United States*, 478 A.2d 644, 656 (D.C. 1984), we have held that, when reviewing prosecutorial remarks during closing arguments, the "court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning, or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Perez*, 968 A.2d at 80 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 646-47 (1974)).

Here, we discern no plain error on the part of the trial court, as it was not required to intervene *sua sponte* in response to the assertions to which Logan belatedly objects. The prosecutor referred directly to the charges in this case and

(…continued)
that affects substantial rights, and (4) that seriously affects the fairness, integrity or public reputation of judicial proceedings." (quoting *Coleman v. United States*, 948 A.2d 534, 544 (D.C. 2008))).

the evidence in this case, and put forward a characterization that was consistent with the government's theory of the case. The prosecutor first stated: "[Y]ou have been sitting in this room with three hardened killers. . . . [L]adies and gentlemen, you have to be willing to consider that these defendants – these defendants brutally attacked Carnell Bolden, a man with children, a life, a girlfriend." Later in his closing, he said: "[Y]ou have to . . . accept the fact that you have been sitting in a room with stone-cold killers almost every day for the last several weeks. And the evidence in this case, ladies and gentlemen, proves beyond a reasonable doubt that that is what these people are." There was no mention of the character of appellants or any reference to evidence other than the evidence in this case. As to the request to vindicate suffering and ensure justice, even assuming some ambiguity in this remark, it cannot reasonably be construed as an improper call for vengeance.

### H. Logan's Unannounced PFCV Conviction

Pursuant to Superior Court Rule of Criminal Procedure 31, "[t]he jury must return its verdict to a judge in open court." Super. Ct. Crim. R. 31 (a). We have held that, until the verdict has been announced in open court, giving the parties an opportunity to poll the jurors for unanimous agreement, the verdict is not final. *See Speaks v. United States*, 617 A.2d 942, 947 (D.C. 1992).

Here, the jury verdict form indicates that it found Logan not guilty of first-degree premeditated murder and second-degree murder, but found him guilty of PFCV during first-degree premeditated murder or second-degree murder. The trial judge asked the jury to state, and the jury foreperson did state, its verdict as to the first-degree premeditated murder and second-degree murder charges against Logan; it found him not guilty. However, the trial judge did not ask the jury to state its verdict on the PFCV count related to first-degree premeditated murder or second-degree murder.

The judge sentenced Logan for five counts of PFCV – four counts of PFCV related to (1) kidnapping, (2) armed robbery, (3) assault with intent to kill, and (4) aggravated assault, as well as (5) one count of PFCV related to first-degree premeditated murder or second-degree murder – all to run concurrently with one another and with the conspiracy sentence, but consecutively to the sentences for the violent crimes.

As Logan rightly asserts, he should not have been sentenced for a conviction that was not read in open court. Therefore, this individual sentence – for the PFCV count related to first-degree premeditated murder or second-degree murder –

should be vacated, and we will remand to allow the trial court to vacate it. We note, however, that, because Logan's sentences for the PFCV convictions run concurrently with one another, vacating one of them will not impact his ultimate prison term.

## I. Merger of Convictions

Finally, appellants argue that several of their convictions should merge. Logan contends, and the government does not contest, that his convictions for mayhem and for aggravated assault should merge. Logan and Watson also contend, again without opposition from the government, that their convictions for felony murder merge with their convictions for the predicate felonies. Additionally, Ashby argues that his convictions for first-degree premeditated murder and felony murder should merge, and that his PFCV convictions related to the merged offenses should also merge. The government offers no response to Ashby's arguments.

As these arguments regarding merger of convictions appear to have merit, we will remand for the trial court to address the merger issues. We note that the merger of some of the convictions in this case may have little practical effect on

the prison terms of appellants, as they are each over fifty years old, Ashby and Watson were sentenced to ninety and seventy-three years respectively (each with thirty-three year mandatory minimums), Logan was sentenced to life in prison, and several of their sentences are set to run concurrently. Nevertheless, we remand to allow these convictions to be properly merged and the sentences to be adjusted accordingly.

## III. CONCLUSION

For the foregoing reasons, we affirm in part and remand in part. We remand to the trial court to vacate Logan's unannounced PFCV conviction and to merge any convictions that should be merged. The judgments are otherwise affirmed.

*So ordered*.