*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CF-432

LORI FITZGERALD, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CF3-6343-17)

(Hon. Danya A. Dayson, Trial Judge)

(Argued January 29, 2020                    Decided June 4, 2020)

*Gregory M. Lipper* for appellant.

*Eric Hansford*, with whom *Jessie K. Liu*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *John P. Mannarino*, *Michael McCarthy*, and *Gregory Rosen*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and GLICKMAN and MCLEESE, *Associate Judges*.

BLACKBURNE-RIGSBY, *Chief Judge*:  Appellant Lori Fitzgerald, whose legal name is now Zakiya Ahmed, was convicted by a jury of several offenses arising out of a home invasion of the apartment of complainant Hunion Henderson.  On appeal, appellant raises an evidentiary sufficiency challenge to her firearm-related

and robbery convictions and an instructional challenge to her obstruction of justice conviction. For the reasons explained below, we reverse the obstruction of justice conviction and affirm the other convictions.

## I. Factual and Procedural Background

### A. The Charges

On July 11, 2017, appellant was indicted for multiple offenses arising out of a January 5, 2017, incident at the home of Henderson. She was tried by a jury in December 2017. Appellant had been indicted on seventeen counts, but, soon after opening arguments, the government dismissed the six counts that had been based on the testimony of cooperating witness Larry Kimbrugh, whom the government decided it would no longer sponsor due to inconsistencies in his statements that emerged just before and immediately after the start of trial.[1] Thus, with the exception of an obstruction of justice count, which had no complaining witness,

---

[1] Appellant's counsel moved for a mistrial when the government announced that it would no longer be sponsoring Kimbrugh. The trial court denied the motion, ruling that any prejudice to appellant was cured by the court explaining to the jury that the counts of the indictment that had been dismissed were related to Kimbrugh and by the court permitting appellant to call Kimbrugh as a hostile witness. Appellant does not raise this issue on appeal.

Henderson was the complaining witness for the remaining counts, which included several violent offenses and several charges of Possession of a Firearm during a Crime of Violence ("PFCV") pertaining to the predicate offenses:

- Count 1 – Conspiracy to Commit Burglary (D.C. Code §§ 22-1805a, -801, -4502) (2012 Repl. & 2019 Supp.)
- Count 2 – Kidnapping while Armed (D.C. Code §§ 22-2001, -4502) (2019 Supp.)
- Count 3 – PFCV as to Kidnapping while Armed (D.C. Code § 22-4504(b)) (2019 Supp.)
- Count 6 – First Degree Burglary while Armed (D.C. Code §§ 22-801(a), -4502) (2019 Supp.)
- Count 7 – PFCV as to First Degree Burglary while Armed (D.C. Code § 22-4504(b)) (2019 Supp.)
- Count 8 – Robbery while Armed (D.C. Code §§ 22-2801, -4502) (2019 Supp.)
- Count 9 – PFCV as to Robbery while Armed (D.C. Code § 22-4504(b)) (2019 Supp.)
- Count 12 – Assault with a dangerous weapon ("ADW") (D.C. Code § 22-402) (2019 Supp.)
- Count 13 – PFCV as to ADW (D.C. Code § 22-4504(b)) (2019 Supp.)
- Count 16 – Threats to Injure or Kidnap (D.C. Code § 22-1810) (2019 Supp.)
- Count 17 – Obstruction of Justice (D.C. Code § 22-722(a)(4)) (2019 Supp.)

**B. The Evidence at Trial**

The government's main witness at trial was Henderson, who testified as follows. He was fifty-four years old, had several physical and mental health issues, and had been addicted to crack cocaine for decades. Appellant was a fellow

drug user whom Henderson had met and gotten to know in the drug scene; Henderson considered appellant, who was older than him, to be like an aunt to him and referred to her as "auntie." During 2016, while Henderson was in and out of rehab, his health was poor, and he needed assistance at home, he invited appellant and her boyfriend, known as "Fanbone," to live with him and take care of him. At first, appellant treated Henderson well; she would cook for him, help him pay bills, and negotiate with people to whom he owed money. However, appellant and Fanbone then began bringing other drug users to Henderson's apartment, and using and selling drugs – including crack and heroin – in the apartment. Although Henderson did not like the drug traffic in his home, particularly because he was in public housing, he acquiesced. As Henderson's relationship with appellant deteriorated and he came to feel that appellant did not care about him anymore, Henderson told appellant and Fanbone that he was afraid of them and uncomfortable with what was happening in the apartment, and he asked them to move out several times, but they refused to do so.

At some point, Henderson talked with his family about the problems he was having at his apartment due to appellant and Fanbone's behavior, and his brother connected him with the police. Henderson spoke to Sergeant Curt Sloan of the Metropolitan Police Department ("MPD"), telling Sergeant Sloan that there were

drugs in his apartment, as well as guns that an acquaintance of appellant had brought in. Henderson then told appellant that his brother had spoken to the police and that the police would be coming to the apartment; Henderson recommended that appellant and Fanbone leave, but they refused to do so.

On the evening of January 4, 2017, MPD officers, including Sergeant Sloan, arrived at the apartment with a search warrant. The officers searched the premises and detained the six individuals who were inside the apartment: Henderson, appellant, Fanbone, Kimbrugh, and two others. Some of the officers took appellant and the others outside, while Henderson remained in the apartment with Sergeant Sloan. While she was outside, appellant called Henderson's phone; Henderson answered and gave the phone to Sergeant Sloan, who told appellant not to come back to the apartment.

In the very early morning hours of January 5, 2017, appellant and Henderson exchanged several text messages, in which appellant told Henderson that she needed to return to the apartment to retrieve some of her belongings, including her "papers" because she was meeting with her "case manager" the next day; her clothes and shoes; and Fanbone's "black bank card." Henderson responded by text message that appellant could not return because the police were watching his place

and he did not want to get in trouble. Appellant replied, "Let's do it your way. As long as you give me our stuff, there won't be a problem"; she also sent messages saying: "I'm out in the street," "I don't mean you harm," and "I just want my things." At one point, appellant asked if she should send "Rochelle or India or [her] protector." Rochelle Gordon was Henderson's neighbor and a friend of appellant's, and India Frazier was a friend of appellant's whom Henderson knew, though Henderson did not know who the "protector" was. Henderson agreed to let Gordon into the apartment to retrieve appellant's things, but she never came.

During the time that he was exchanging text messages with appellant, Henderson had let Kimbrugh into the apartment; when Kimbrugh began getting high, Henderson told Kimbrugh to leave and he did. Kimbrugh later came back and banged on the door, saying he wanted his things, and, as Henderson opened the door, three people pushed their way into the apartment: Kimbrugh, Frazier, and Steve Wilson – an acquaintance whom Henderson had met four days earlier when appellant and Fanbone had invited him to a New Year's get-together at the apartment. Wilson hit Henderson with a gun, pointed the gun at him and ordered him to the ground, stomped on his head, kicked him in his side, threatened to shoot him, called him a "fa**ot," and accused him of "snitch[ing] on [his] friend."

Frazier asked Henderson, "[W]hy did you do that" when "[t]hey took care of [you]?" – without specifying to whom "they" referred – and also kicked him.

While Henderson was on the ground, Wilson covered Henderson's head with clothes. Although Henderson's view was mostly obstructed, he observed Wilson, Frazier, and Kimbrugh putting items from the apartment into laundry bags and taking the bags and other things out of the apartment. Henderson listed several items that were taken: (1) some groceries from the refrigerator; (2) two TVs, one of which had been brought in by appellant and Fanbone, and the other of which had been brought in by another acquaintance; (3) some "money," which Henderson then clarified was a "black bank card" that belonged to Fanbone and that Henderson had put in his own pocket; (4) "a chain that didn't belong to me [Henderson]" but "belong[ed] to family members"; (5) "a ring that belonged to me [Henderson]"; and (5) other unspecified "stuff."

About ten minutes after Kimbrugh, Frazier, and Wilson had entered, appellant entered the apartment. Appellant leaned over and quietly spoke into Henderson's ear, calling him a "snitch" and saying, "You thought I wouldn't be able to get in. You thought you had got away," as well as something like, "You

thought that you were going to get away with this, and you're going to pay for this." Then all four individuals left and Henderson called the police.

On cross-examination, Henderson admitted that he had testified before the grand jury that appellant, upon entering the apartment after Wilson and Frazier, said to them, in reference to Henderson: "Don't do nothing to him yet. Don't do nothing to him." Henderson also admitted to inaccuracies in his grand jury testimony. Before the grand jury, he had testified that the things that were taken during the incident belonged to him; however, on cross, he admitted that several items belonged to appellant, Fanbone, or others – including both TVs, the bank card, and some of the groceries in the fridge. He also appeared to admit that the chain that was taken actually belonged to Fanbone. When defense counsel pressed Henderson regarding his ownership of the items taken from the apartment, he stated that he "considers" "[e]verything in the apartment" to be his, "whether it's [his] or not."

After the government rested,[2] the defense called Rochelle Gordon, who testified that appellant contacted her in the early morning hours of January 5 and

---

[2] After Henderson stepped down, the government called Sergeant Sloan, who testified about the January 4 raid.

(…continued)

asked her to retrieve appellant's clothes and belongings from Henderson's apartment. Gordon testified that appellant showed her text messages in which Henderson requested that Gordon retrieve appellant's things. She testified that she went to Henderson's apartment, but, despite banging on the door and announcing herself for ten minutes, Henderson never answered, so she left. She also testified that, upon leaving the building, she saw Kimbrugh exit the building, walk to appellant's car on the street, and talk to three people who were sitting in the car – two of whom were appellant and India Frazier, and the third of whom she did not recognize.[3]

In his closing argument, the prosecutor acknowledged the weaknesses in Henderson's testimony regarding the taking of property during the home invasion, but stated: "[D]on't get wrapped up in that. The point is that there was indiscriminate taking of property, including property of his, from him, off of his person; he referenced a ring. That is the basis for the armed robbery charge in this case."

---

(…continued)

[3] In addition to Gordon, the defense also called three other witnesses, not relevant here. Appellant did not testify.

## C. Jury Deliberations

In instructing the jury, the trial judge followed the pattern criminal jury instructions for the District of Columbia, commonly referred to as the "Red Book." In doing so, she included instructions on co-conspiracy liability and aiding and abetting liability as to the charged offenses. *See* Criminal Jury Instructions for the District of Columbia, No. 7.103 ("Co-Conspirator Liability"), No. 3.200 ("Aiding and Abetting") (5th Ed. rev. 2019). She also included an instruction on robbery, and, at the defense's request and without objection from the government, an instruction on the claim of right defense to robbery, stating, in part, that "if a person takes the property of another in good faith belief that she has the right to take it, the specific intent of the element of robbery is lacking." *See id.* No. 4.300 ("Robbery"), No. 9.521 ("Claim of Right").

Finally, the judge included the Red Book instruction on obstruction of justice under D.C. Code § 22-722(a)(4), stating:

> The elements of the offense of obstructing justice, each of which the Government must prove beyond a reasonable doubt:
>
> That Zakiya Ahmed or an alleged co-conspirator or alleged principal actor injured or threatened to injure Mr. Hunion Henderson;

two, that Zakiya Ahmed or an alleged co-conspirator or alleged principal actor acted voluntarily, on purpose and not by mistake or accident; and

three, that Zakiya Ahmed, an alleged co-conspirator or alleged principal actor injured or threatened to injure Hunion Henderson because he had given information to a criminal investigator.

*See* Criminal Jury Instructions, No. 6.101(D) ("Obstructing Justice: Injuring witness or his property").

During deliberations, the jury announced that it had convicted on eight counts and acquitted on two counts (discussed further below). It then resumed deliberations only on the obstruction of justice count; soon thereafter, it sent a note to the trial judge seeking clarification on the obstruction count. The note stated:

If we find beyond a reasonable doubt that these three facts . . . independent of each other, are true,

A, Onion (phonetic) [Hunion Henderson] had given information to a criminal investigator;

B, police/criminal investigators kept Zakiya from her belongings in the apartment; and

three, the assault and its resulting injuries happened in an attempt to get Zakiya's belongings that were in the apartment,

does that satisfy element 3 of count 17, obstruction of justice?

The judge heard extensive argument from the parties regarding the proper response to the jury note.[4] The judge then delivered this re-instruction to the jury, both orally and in writing:

> In order to prove the third element of the offense of obstruction of justice, the Government must prove beyond a reasonable doubt that Zakiya Ahmed's actions and Mr. Henderson's injuries came about as a result of Mr. Henderson providing information to the criminal investigator.
>
> If you find that Mr. Henderson providing information to the criminal investigator was not a reason for the injuries to Mr. Henderson, you must find the defendant not guilty of the obstruction of justice charge.

---

[4] During this exchange, in which the judge solicited input from both sides, defense counsel stated: "[I]t's got to be a specific intent to obstruct justice, not to get your property." The judge did not accept this proposal. Counsel then "not[ed], just for the record," that her request had been denied and that she was "preserving it." When the judge asked for clarification, she stated: "[I]f the assault and its injuries happened when [appellant] was trying to get her belongings that were in the apartment, that does not satisfy the third element for obstructing justice"; she elaborated that "[t]here has to be a nexus" between the facts that the jury posited in its note, as they cannot "be independent of each other," as the jury proposed. The judge "note[d] [the] objection" but proposed an alternative formulation, to which the government agreed, and to which defense counsel, after reviewing it, simply said "Thank you."

> If the criminal investigation is wholly independent from the cause of the injuries, you may not find the defendant guilty of obstruction of justice.

Less than an hour later, the jury returned a guilty verdict on the obstruction charge.

Ultimately, the jury acquitted appellant of the conspiracy charge, the burglary charge, and the PFCV charge related to burglary, but it convicted her of unlawful entry as a lesser-included offense of burglary while armed and convicted her of all the other charged offenses. Specifically, appellant was convicted of the following:

- Count 2 – Kidnapping while Armed
- Count 3 – PFCV as to Kidnapping while Armed
- Count 6 – Unlawful Entry
- Count 8 – Robbery while Armed
- Count 9 – PFCV as to Robbery while Armed
- Count 12 – ADW
- Count 13 – PFCV as to ADW
- Count 16 – Threats to injure or kidnap
- Count 17 – Obstruction of Justice

Appellant timely appealed.

## II. Standard of Review

We review the sufficiency of the evidence de novo, *Nero v. United States*, 73 A.3d 153, 157 (D.C. 2013), "view[ing] the evidence in the light most favorable to sustaining the judgment," *Davis v. United States*, 834 A.2d 861, 866 (D.C. 2003), and "making no distinction between direct and circumstantial evidence," *Cherry v. District of Columbia*, 164 A.3d 922, 929 (D.C. 2017) (citation omitted). "Judicial review is deferential, giving full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Davis*, 834 A.2d at 866 (citation and internal quotation marks omitted). "The evidence need not compel a finding of guilt beyond a reasonable doubt, and it need not negate every possible inference of innocence." *Napper v. United States*, 22 A.3d 758, 770 (D.C. 2011) (citation and internal quotation marks omitted). Rather, "proof of guilt is sufficient if . . . *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Davis*, 834 A.2d at 866 (citation and internal quotation marks omitted).

Decisions regarding instructing the jury are committed to the discretion of the trial court and are reversed only for abuse of discretion; however, the accuracy of an instruction itself is a legal question that we review de novo. *See, e.g., Brown v. United States*, 139 A.3d 870, 875 (D.C. 2016); *Taylor v. District of Columbia*,

49 A.3d 1259, 1263-64 (D.C. 2012); *Jordan v. United States*, 18 A.3d 703, 707 (D.C. 2011); *see also Fleming v. United States*, 224 A.3d 213, 219 (D.C. 2020) (en banc) ("Although our terminology has not always been entirely clear on this point, we review de novo whether challenged jury instructions adequately state the law."). With respect to re-instruction in particular, we have stated that the trial court must appropriately and effectively respond to demonstrated confusion on the part of the jury and must address, with "concrete accuracy," any specific difficulties the jury is having in understanding the law. *Colbert v. United States*, 125 A.3d 326, 334 (D.C. 2015).

## III. Discussion

### A. Firearm-Related Offenses

Appellant argues that the evidence was insufficient to convict her of the three charges that involved an "armed" element (kidnapping while armed, burglary while armed, and ADW) and the three PFCV charges related to those predicate crimes. In particular, she argues that the government failed to carry its burden to convict her of these six firearm-related offenses under co-conspiracy liability because the evidence was too speculative to demonstrate the mens rea required to

convict a co-conspirator on these counts, i.e., that it was reasonably foreseeable that Wilson would use or possess a gun during the incident.[5]  We disagree.

In the District, the elements of co-conspiracy liability are the existence of an agreement, the commission of a substantive crime in furtherance of that agreement, and the reasonable foreseeability of the substantive crime as a consequence of the agreement.  *Clark*, 147 A.3d at 327; *Wilson-Bey v. United States*, 903 A.2d 818, 840 (D.C. 2006) (en banc); *see also* Criminal Jury Instructions, No. 7.102 cmt. ("Conspiracy"), No. 7.103 ("Co-Conspirator Liability").[6]

---

[5]  Appellant appears to acknowledge that, although the jury acquitted her of the conspiracy charge (count 1), it was entitled to convict her of other charges under co-conspiracy liability.  Indeed, we have repeatedly held that jury verdicts need not be consistent with each other, and that we review each conviction independently, as if it were in a separate indictment.  *Clark v. United States*, 147 A.3d 318, 328 n.14 (D.C. 2016); *Richardson v. United States*, 116 A.3d 434, 443 (D.C. 2015).

[6]  The foreseeability element, first articulated by the Supreme Court in *Pinkerton v. United States*, 328 U.S. 640, 646-48 (1946), has not been adopted by all jurisdictions.  *See, e.g.*, Matthew A. Pauley, *The Pinkerton Doctrine and Murder*, 4 Pierce L. Rev. 1, 4 & nn. 9 & 11 (2005).  However, "[t]his court has adopted and applied the *Pinkerton* doctrine," *Ashby v. United States*, 199 A.3d 634, 665 (D.C. 2019), which "provides that a co-conspirator who does not directly commit a substantive offense may nevertheless be held liable for that offense if it was committed by another co-conspirator in furtherance of the conspiracy and was a reasonably foreseeable consequence of the conspiratorial agreement."  *Id.* (quoting *Wilson-Bey*, 903 A.2d at 840) (cleaned up)).

*Wilson-Bey* acknowledged and explained, but did not apply, *Pinkerton*
(…continued)

The evidence in this case was sufficient to satisfy the foreseeability element. Henderson testified that, as a result of appellant and Fanbone's activities, there had been drug use, drug sales, and guns in the apartment prior to the home invasion;

---

(…continued)

liability because the facts of that case did not give rise to co-conspiracy liability. *See* 903 A.2d at 842. However, this court has explicitly or implicitly recognized the validity and applicability of *Pinkerton* liability on several occasions. *See, e.g.*, *Clark*, 147 A.3d at 327 (citing *Wilson-Bey* for the *Pinkerton* principle and applying it to affirm a conviction, without explicitly mentioning *Pinkerton*); *Richardson*, 116 A.3d at 442 (affirming a conviction because the "evidence was sufficient under a straightforward application of *Pinkerton*"); *Hagans v. United States*, 96 A.3d 1, 23-25 (D.C. 2014) (implicitly endorsing the trial court's use of a *Pinkerton* jury instruction in a conspiracy case and discussing complications that may arise in the context of vicarious liability for hearsay statements); *Baker v. United States*, 867 A.2d 988, 1005 (D.C. 2005) (holding that a *Pinkerton* instruction may be given even without an indicted conspiracy charge); *Williams v. United States*, 858 A.2d 978, 983 (D.C. 2004) (recognizing the validity of a *Pinkerton* instruction and reversing on other grounds); *Gordon v. United States*, 783 A.2d 575, 581-82 (D.C. 2001) (stating that a *Pinkerton* instruction explains to the jury that the substantive offense committed by a co-conspirator must be reasonably foreseeable and committed in furtherance of the conspiracy); *Thomas v. United States*, 748 A.2d 931, 934-35 (D.C. 2000) (noting that, "[i]n several instances, this court has previously recognized *Pinkerton* liability generally," and concluding that *Pinkerton* "does not offend the grand jury clause, even absent a conspiracy charge in the indictment"); *Erskines v. United States*, 696 A.2d 1077, 1080 (D.C. 1997) (discussing the validity and applicability of *Pinkerton*); *Akins v. United States*, 679 A.2d 1017, 1031 (D.C. 1996) (overruled in part on other grounds) (acknowledging the validity of *Pinkerton* instructions, but holding that a co-conspirator's statement may not be introduced under any hearsay exception that is not reliability-based unless the statement is admissible as a co-conspirator's statement made in furtherance of the conspiracy); *see also* Criminal Jury Instructions, No. 7.103 cmt. ("Co-Conspirator Liability") (stating that the Red Book instruction is based on *Pinkerton* and citing cases in which this court has upheld *Pinkerton* liability).

indeed, that is what served as the basis for the police raid, which occurred only hours before the home invasion and for which appellant was present. Henderson also testified that appellant knew Wilson and had invited him to a get-together at the apartment. Appellant sent Henderson a text message just before the incident saying that she may send her "protector" to retrieve her things, and Gordon testified that appellant was sitting with two other people in her car outside of the apartment building when Kimbrugh went to talk to them: Frazier and another person whom she did not recognize. Henderson also testified that appellant and Wilson participated in the home invasion together, during which appellant gave Wilson and Frazier instructions with respect to Henderson (to the effect of "Don't do nothing to him yet. Don't do nothing to him."). Thus, the evidence established that the nature of the incident was forcible entry into a home, and that appellant was aware that there had recently been guns and drugs sales in that home. The evidence further established that appellant knew Wilson well enough for him to assist her in forcibly retrieving her things from the apartment. The evidence could also support a reasonable inference that Wilson was the "protector" whom appellant referenced – a moniker that implies the use of force, including a weapon.[7]

---

[7] Appellant is correct that this case is distinguishable in certain respects from *Richardson*, in which we concluded that it was reasonably foreseeable that

(…continued)

Accordingly, viewing the evidence in the light most favorable to sustaining the judgment and giving the jury full play to draw reasonable inferences from that evidence, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Wilson's possession of a gun during the crime was reasonably foreseeable. We emphasize, however, that, one person's possession or use of a weapon in the commission of a crime is not automatically imputable, under co-conspiracy liability, to others involved in the crime. To the contrary, this court must examine the facts and circumstances in each case to determine whether the evidence supported a jury instruction on co-conspirator liability for a weapon-related offense and whether a rational jury examining that evidence could find beyond a reasonable doubt that the possession or use of a weapon by one of the co-conspirators was reasonably foreseeable. In this case, we have engaged in such an

(…continued)
Richardson's co-conspirator would possess a knife in furtherance of the conspiracy, and from two cases cited by the *Richardson* court: *United States v. Willis*, 899 F.2d 873, 875 (9th Cir. 1990), and *United States v. Smith*, 697 F.3d 625, 635 (7th Cir. 2012). *Richardson*, 116 A.3d at 441. Unlike in *Richardson* and *Willis*, there was no evidence in this case that appellant and Wilson lived together or were close associates, and unlike in *Smith*, this case did not involve a bank robbery. But we have never required the presence of those or any other specific factors to conclude that possession or use of a weapon was reasonably foreseeable. Rather, as explained below, we look to the evidence presented to the jury in each case to determine whether it was sufficient to support a finding of reasonable foreseeability.

examination, and we conclude that the evidence was sufficient to sustain the convictions on the firearm-related offenses under co-conspirator liability.[8]

**B. Robbery**

Appellant argues that, given Henderson's contradictory testimony regarding his ownership of the items that were taken from the apartment, as well as the jury instruction on the claim of right defense, the evidence was insufficient to convict her of robbery. We are not persuaded.

We have previously explained that robbery is a specific intent crime, requiring the government to prove that a defendant acted with the specific intent to steal. *See, e.g.*, *Bell v. United States*, 950 A.2d 56, 69 (D.C. 2008); *Simmons v. United States*, 554 A.2d 1167, 1169 (D.C. 1989); Criminal Jury Instructions, No. 4.300 cmt. ("Robbery").[9] A claim of right defense asserts that a defendant had a

---

[8] Because we hold that the firearm-related convictions can be sustained under co-conspiracy liability, we do not reach appellant's argument that these convictions could not have been sustained only under aiding and abetting liability.

[9] More recently, however, we have expressed concern regarding the use of specific intent and general intent as categories of mens rea. *See Carrell v. United States*, 165 A.3d 314, 323-34 & nn. 26 & 27 (D.C. 2017) (en banc).

good faith belief in his or her right to take an item, which negates the intent element of robbery. Criminal Jury Instructions, No. 9.521 ("Claim of Right"). Thus, this defense, if credited by the jury, will render the evidence insufficient to convict a defendant of robbery because the government will have failed to prove the mens rea element of the crime. *See, e.g., Smith v. United States*, 330 A.2d 519, 521 (D.C. 1974).[10]

Because appellant did not testify, the direct evidence of her good faith belief is limited, though her text messages indicated her intent to retrieve her own belongings from the apartment (including papers and clothing). Nevertheless, Henderson's testimony served as circumstantial evidence of appellant's belief

---

[10] The claim of right issue in this case is complicated by the fact that there was no evidence that appellant herself took any property from Henderson's apartment; rather, Henderson's testimony was that Frazier, Wilson, and Kimbrugh took the property. (Because actual taking is an element of robbery, appellant was necessarily convicted of robbery under either co-conspiracy liability or aiding and abetting liability, both of which were presented to the jury – and neither of which appellant challenges as to the underlying robbery count, as her vicarious liability challenge to the robbery conviction pertains only to its "while armed" component, as discussed above.) The question is therefore whether appellant had a good faith belief that she had a right to take the property that was actually taken (in this case, by others). *See* Criminal Jury Instructions, No. 9.521 cmt. ("A defense of claim of right must relate to the items taken."); *cf. Robertson v. United States*, 429 A.2d 192, 195 n.5 (D.C. 1981) (permitting a claim of right defense when the amount taken was less than the amount of the alleged debt owed by the robbery victim, but not when the amount taken was greater than the amount of the alleged debt).

regarding the items that were taken. While Henderson disclaimed ownership of certain items (such as a TV that belonged to appellant and Fanbone, a TV that belonged to another acquaintance, and a bank card and a chain that belonged to Fanbone), he also stated that the ring and some of the groceries in the refrigerator belonged to him – and the prosecutor specifically emphasized the ring in his closing argument. Moreover, while Henderson asserted that he considered everything in the apartment to be his, whether or not he actually owned it, we have often reiterated that it is the province of the jury to weigh evidence and that a jury may credit portions of a witness's testimony and discredit others. *See, e.g.,* *Hughes v. United States*, 150 A.3d 289, 305 (D.C. 2016). Finally, the volume and variety of items that were taken – Henderson testified that Wilson, Frazier, and Kimbrugh started putting things in laundry bags and taking them out of the apartment – could support a reasonable inference on the part of the jury that items were taken indiscriminately, including items actually owned by Henderson.

As noted, the evidence need not negate every possible inference of innocence or compel a finding of guilt. In light of Henderson's testimony and the reasonable inferences that could be drawn from that testimony, the evidence was sufficient for the jury to conclude that appellant lacked a good faith belief in her right to take at least some of the items taken from Henderson's apartment. Thus,

there was sufficient evidence for a reasonable jury to reject the claim of right defense and find beyond a reasonable doubt that the requisite mens rea for robbery was present. Appellant's robbery conviction must stand.

## C. Obstruction of Justice

Finally, appellant argues that the trial court erred in its response to the jury's question about the obstruction of justice count. She asserts that the trial court's response to the jury note was legally incorrect and that this incorrect response clearly influenced the jury's verdict. Because the trial court's re-instruction in response to the jury note constituted a substantive articulation of the applicable law, we review its legal accuracy de novo. See *supra* Section II. Reviewing under this standard, we agree with appellant.[11]

---

[11] The government argues that appellant forfeited this argument by agreeing to the trial judge's response to the jury note, see *supra* note 4, and that this court should therefore review the claim only for plain error. We disagree. Counsel's "thank you" appears to have been a simple showing of deference to the trial judge after the judge had "note[d] [her] objection" and ruled against her. Under the circumstances, this exchange was sufficient to preserve the objection. *Cf. In re Ty.B.*, 878 A.2d 1255, 1263 (D.C. 2005) ("To require counsel . . . to object again would be to require a pointless formality." (cleaned up)). We therefore review this claim squarely, rather than for plain error.

Appellant was charged under subsection (a)(4) of the obstruction statute, which states that a person commits obstruction if she "[i]njures or threatens to injure any person or his or her property on account of the person or any other person giving to a criminal investigator in the course of any criminal investigation information related to a violation of any criminal statute." D.C. Code § 22-722(a)(4). The Red Book instruction, which the trial court read to the jury and included in the written jury instructions, is a relatively straightforward rendering of the text of § 22-722(a)(4) into discrete elements, though it substitutes the word "because" for the phrase "on account of:"

> The elements of the offense of obstructing justice, each of which the government must prove beyond a reasonable doubt, are that:
>
> 1. [Defendant] [injured] [complainant];
>
> 2. [Defendant] acted voluntarily, on purpose, and not by mistake or accident; and
>
> 3. [Defendant] [injured] [complainant] because [s/he] had given information to a criminal investigator.

Criminal Jury Instructions, No. 6.101(D) (bracketed material cleaned up).[12] The first and second elements address actus reus and mens rea, respectively. The

---

[12] The Red Book is, of course, not law, but it aims to accurately reflect the law. *See, e.g., Thurston v. United States*, 779 A.2d 260, 262 (D.C. 2001).

dispute here centers around the third element, which goes to motive.[13]

Our case law has substantively addressed (a)(4) twice, each time only briefly. In *Mayhand v. United States*, we repeated the "on account of" language from the statute: while we reversed the conviction in that case based on the admission of inadmissible hearsay, we noted that the evidence would have been sufficient to convict under (a)(4) because the evidence – including the inadmissible hearsay – "provided a sufficient basis for a reasonable fact-finder to infer that [the appellant] had threatened to injure [the complainant] and had done so 'on account of' the information [the complainant] gave to law enforcement." 127 A.3d 1198, 1204, 1212 (D.C. 2015). In *McCullough v. United States*, however, we clarified that retaliation satisfies the motive element. 827 A.2d 48, 58 (D.C. 2003). The evidence in that case showed that the co-conspirators killed an acquaintance after

_____

[13] At trial and in her briefing before this court, appellant used the term "specific intent" to refer to this element, though that term may confuse more than it clarifies, as the intent (mens rea) element of obstruction of justice is not at issue here. We note that our case law has not addressed the mens rea element of (a)(4), but has recognized that two other subsections of D.C. Code § 22-722 require specific intent: (a)(2), which pertains to interfering with witnesses in official proceedings, *Crutchfield v. United States*, 779 A.2d 307, 325 (D.C. 2001), and (a)(6), which pertains to impeding "the due administration of justice in any official proceeding," *Hawkins v. United States*, 119 A.3d 687, 695 (D.C. 2015). We also note, as mentioned above, see *supra* note 9, the concern we have expressed in recent years regarding the use of specific intent and general intent as categories of mens rea. *See Carrell*, 165 A.3d at 323-34 & nn. 26 & 27.

one of the conspirators confirmed to others that the acquaintance had become a government informant and was planning to serve as a witness; we therefore concluded that (a)(4) "was satisfied because [the informant] was killed in retaliation for giving information to the police about criminal activity. *Id*.[14]

It is clear that the trial court's response to the jury note went beyond the statute, the Red Book instruction, and our case law. The trial court stated that the third element of (a)(4) would be satisfied if the government proved that "Zakiya Ahmed's actions and Mr. Henderson's injuries came about *as a result of* Mr. Henderson providing information to the criminal investigator," and that appellant must be acquitted if "Mr. Henderson providing information to the criminal investigator was *not a reason for* the injuries to Mr. Henderson" or "the criminal investigation [was] *wholly independent from* the cause of the injuries" (emphasis added). These formulations do not clearly refer to appellant's motive or identify motive as the link between appellant's actions and Henderson's injury. Accordingly, the re-instruction cannot be squared with the statute, which requires that a defendant "[i]njure[]. . . [a] person . . . *on account of* the person or any other

---

[14] In another case, *Wynn v. United States*, we noted briefly, in our analysis of (a)(6), that (a)(4)'s reference to criminal investigations includes police investigations. 48 A.3d 181, 190 (D.C. 2012).

person giving [information] to a criminal investigator," D.C. Code § 22-722(a)(4) (emphasis added); with the Red Book instruction, which requires that a defendant "injure[] complainant *because* he had given information to a criminal investigator," Criminal Jury Instructions, No. 6.101(D) (emphasis added and brackets omitted); or with *McCullough*, which found obstruction where a defendant killed the victim "*in retaliation for*" the victim giving information to police, 827 A.2d at 58 (emphasis added). While the trial court's response contemplates a causal relationship between Henderson's police cooperation and Henderson's injuries, as well as a causal relationship between appellant's action and Henderson's injuries, it omits motive, which is a necessary element of the crime. Appellant's actions that injured Henderson must have been motivated by Henderson giving information to the police.

Under the trial court's formulation, even if appellant's *sole* motive in going to Henderson's apartment was to retrieve her belongings – meaning appellant (and her co-conspirators) did not injure Henderson "on account of," "because of," or "in retaliation for" Henderson giving information to the police – appellant would still be guilty of obstruction because Henderson's injuries indirectly resulted from a chain of events that involved Henderson talking to the police, the police raiding the apartment, appellant being put out of the apartment without her belongings,

appellant later returning with others to forcibly retrieve her things from the apartment, and Henderson being injured during the retrieval incident. But (a)(4) does not criminalize all injuries that result in some way from a complainant providing information to a criminal investigator; it only criminalizes injuries that were motivated by that provision of information.[15] While the trial court was understandably attempting to clear up the jury's confusion, as required by our case law, it made a substantive statement of law that was not consistent with applicable authorities. Thus, reviewing de novo for legal accuracy, we conclude that the trial court's response to the jury note was error.

Nor was the error harmless. The trial court's re-instruction permitted the jury to conclude that, if there was *any* connection between Henderson giving information to the police and Henderson's injury – no matter how attenuated or mediated – the third element of (a)(4) was satisfied. In other words, the jury

---

[15] According to the trial court's formulation of the jury instruction, other scenarios in which the requisite motive was absent could potentially amount to obstruction. For instance, if one of the officers who participated in the police raid on Henderson's apartment had used excessive force in detaining Henderson and had injured him, that officer could be guilty of obstruction – even if the officer was completely unaware that Henderson had given information to the police – because Henderson giving information to the police was "*a* reason" for Henderson's injuries, Henderson's injuries were "*a* result" of his giving that information, and the information and his injuries were not "*wholly* independent." We do not think this is the type of conduct at which (a)(4) is aimed.

instruction permitted the jury to convict appellant even if it found that appellant did not take any action to injure Henderson that was motivated by – i.e., taken on account of, because of, or in retaliation for – Henderson's contact with the police. Under these circumstances, we cannot say, with fair assurance, that the verdict was not substantially swayed by the error. *Shelton v. United States*, 983 A.2d 979, 983 (D.C. 2009) ("To find an instructional error harmless, we must be satisfied 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946) (cleaned up)). Accordingly, we reverse on this count.

## IV. Conclusion

For the reasons discussed, we conclude that the evidence was sufficient to support appellant's convictions on the firearm-related charges under co-conspiracy liability and sufficient to support appellant's robbery conviction despite the claim of right defense, and we therefore affirm those convictions. However, we conclude that the jury re-instruction on obstruction of justice constituted legal error and the error was not harmless; we therefore reverse the obstruction of justice conviction.

*So ordered.*